

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**AL M. WILLIAMS, et al., Pro Se'**
**PLAINTIFFS**

NOV 16 2011

JAMES W. McCORMACK, CLERK
.By:_____

vs.            Civil Action Docket No:_____

2: 11CV00210 BSM/HOY

**JEREMY HENSON, et al.**
**DEFENDANTS**

## CLASS ACTION
### COMPLAINT FOR VIOLATION OF CIVIL RIGHTS UNDER
### 42 U.S.C. § 1983 (2000)

### I.  Previous lawsuits

      **A.**    Have you begun other lawsuits in state of federal court dealing with the same facts? involved in this action or otherwise relating to your imprisonment?  Yes  (X)  No  ( )

      **B.**    If your answer to A is yes, describe each lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)  2:09CV00100 JLH/D

      **Parties to this previous lawsuit:**  See filing in the United States District Court for Eastern District of Arkansas

      **A) <u>Plaintiff:</u>** AL M. WILLIAMS

This case assigned to District Judge _____
and to Magistrate Judge _____

      **B) <u>Defendants:</u>**  Lonnic Whitfield, ct al.

### II.      Place of Present Confinement: Hardeman County Correctional Facitlity Inc.

      A. Is there a prisoner grievance procedure in the institution? Yes    ( X )

      B.  Did you present the facts relating to your complaint in the state prisoner grievance procedure?        Yes    ( X )

      C.  If your answer is yes:

      1.  What steps did you take?  I filed seven (7) handwritten grievances, and delivered them personally to Lonnie Whitfield, Deputy jailor James Bell, Deputy Jailor Corrine , and "jailor James"

      2.  What was the result?        They were either destroyed or ignored.

## III.    PARTIES TO INSTANT ACTION:

(In item A below, place your name in the first blank and place your present address in the second blank. Do the same for additional plaintiffs, if any.

### A.  Name of Plaintiffs:

1)  **JOHN DOES**, referenced today as others similarily situated.

2)  Al M. Williams, et al.
   P.O.Box 549/362773
   Whiteville, TN 38075

(In item B below, place the full name of the defendant in the first blank, his official position in the second blank, and his place of employment in the third blank.  Use Item C for the names, position, and places of employment of any additional defendants.

### B.  Defendants listed below are being sued in both their individual and professional capacities:

1.      CITY OF MARVELL, Municipality

2.      JAILOR, "JAMES", Phillips County Sheriff's Deputy

3.      JAILOR, RUBEN ROBINSON, Phillips County Sheriff's Deputy

4.      RONNIE WHITE, Phillips County Sheriff

5.      TIMOTHY HARRIS, City of Marvell Police Officer

6.      JAILOR, JAMES BELL, Phillips County Sheriff's Deputy

7.      JAILOR, CORRINE, Phillips County Sheriff's Deputy

8.      LONNIE    WHITFIELD,    Phillips    County    Detention    Facilities,
   Adminiostrator

9.      PHILLIPS COUNTY MUNICIPALITY

10.     MARVELL POLICE CHIEF WALLACE, City of Marvell

11.     PHILLIPS  COUNTY SHERIFF'S DEPUTY JEREMY HENSON

12.     PHILLIPS  COUNTY SHERIFF'S DEPUTY DAVID LAWMAN

13.     PHILLIPS COUNTY SHERIFF'S DEPARTMENT

14.     HELENA  REGIONAL  MEDICAL  CENTER  d/b/a  Philips  Hospital
   Corporation

15.     ARTHUR LEVY, MD, Emergency Room Supervising Physician.

## IV.   STATEMENT OF CLAIMS:

A. *1st Amendment Violation:  Retaliation and/or Harassment for exercise of a protected Right*

B. *4th Amendment Violation: Unreasonable Seizure*

C. *4th Amendment Violation: Arrest Without Probable Cause*

D. *4th Amendment Violation: False Imprisonment*

E. *4th Amendment Violation: Warrantless Arrest*

F. *Malicious Abuse of Process*

G. *4th Amendment Violation: Deliberate Indifference to a citizens Welfare, Well-being,  and  Liberty Interests Rights*

H. *14th Amendment Violation : Malicious Prosecution:*

I. *4th & 14th Amendment Violations :Wrongful Arrest/Illegal Detention*

J. *8th Amendment Violation: Cruel and Unusual Punishment*

H. *8th Amendment Violation: Deliberate Indifference to a Serious Medical Need*

L. *4th Amendment Violation: Illegal Seizure*

M. *Violation of EMTALA*

N. *Medical Malpractice*

O. *1st Amendment Violation: Conspiracy to Violate/Deny a Protected Right*

P. *4tt Amendment Violation: Denial of Access to the Courts*

Q. *Defamation*

## V. INTRODUCTION

I'm going to be straight forward with you for the sake of simplicity, This is a classic case where a citizens Civil Rights were violated by authorities/state actors responsible for protecting both his Common-law and Civil Rights. These were all public officials / servants whose actions were, in complete disregard to these protected rights, as though they were above the law. You will see that they were insensitive, callous, and cruel; because they did not and will not hesitate to throw a man in jail without an arrest warrant or probable cause hearing.

This jail does not even maintain the minimum standards of medical care for its inmates. They don't give a hoot about whether or not an inmates medical needs are met, and this is not the first, second, or third time this has happened to the inmates at the Phillips County Detention Facility. This is an established pattern of misconduct so thoroughly established that it's employees, the custodians, feel like its no big deal, that an inmate suffers needlessly. The employer's exhibit a condescending aire of superiority and could care less about its inmates needs, once those steel doors have closed behind them, because they know that once those (3) inch steel doors close, the inmates are in for the shock of their lives. The consistent pattern of misconduct and corruption in this underworld dungeon must be exposed at all costs. Once you are in there you will not get out unless they say so, regardless of your protected rights to due process, regardless if you have funds to facilitate your release. There is no due process system in place and you will not be provided medical attention, because this place is run like a dungeon, not a detention facility, as it is so named.

All know that the infliction of unnecessary pain and suffering on an inmate by failure to treat his medical needs is inconsistent with contemporary standards of decency and violates the Eighth Amendment of the United States constitution.

The Eighth Amendment embodies "Broad idealistic concepts of dignity, civilized standards, of humanity, and decency and violates the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society."

These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely upon jail

4

authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met, in worst case scenarios, such a failure may actually produce *physical torture* or a *lingering death*; the evils of most immediate concerns to the drafters of the 8th Amendment of the United States Constitution. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penalogical purpose. *Gregg v. Georgia, supra, at 173, 196 S. CT. at 2924.* This infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that *"(I)t is but just that the public he required to care for the prisoner, who cannot, by reason of the deprivation of his liberty, care for himself!"*

I therefore conclude that both Medical Negligence and Deliberate Indifference to Serious Medical Needs of inmates constitutes the "unnecessary and wanton infliction of pain," . *Gregg v. Georgia, supra, at 173, 196 S. Ct. at 2925*, proscribed by the 8th Amendment, Amendment, This is true whether indiference is manifested by jailhouse doctors in their response to inmates medical needs or by jailhouse guards intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, Deliberate Indifference to an inmates serious illness or injury; it states a cause of action for both Medical Negligence and Deliberate Indifference to Serious Medical Needs.

If the government elects to impose imprisonment as punishment for a crime, it has a statutory obligation to provide the persons in its custody with a healthcare system, which meets the minimal standards of adequacy. As part of this basic obligation, *the county and its agents have an affirmative duty to provide competent, diligent medical personnel, and ensure that the prescribed care is in fact delivered, for denial of medical care is surely not part of the punishment which a civilized nations may impose for a crime!*

Today the plaintiff is asking the Court to intervene by awarding him compensation for damages sustained, as well as punish the defendants, his captors, for their Deliberate indifference to his liberty interests and his serious medical needs, both federally protected rights. The Court must compel the jail, county, and local authorities to honor its citizens due process rights and at least meet the minimum standards of medical care thereby protecting the citizens 4th, 8th, and 14th amendment rights to prevent irreparable harm to himself and others similarly situated as well.

This is an established pattern of misconduct by the Marvell Police Department and the Phillips County Sheriff's Department, and mostly the Phillips County Detention Facility. This pattern of misconduct is so well established that it serves as an unwritten rule and/or policy statement that allows its officials to casually engage in this type of misconduct unconsciously !

## VI. COMPLAINT
### {factual background }

*These facts are being plead with particularity with the express purpose of triggering the new disclosure mechanism of Rule 26(a)(1) Federal Rules of Civil Procedures.*

1.  Phillips County Detention Facility, located in Helena, Arkansas does not have a nurse, doctor, or healthcare provider on staff.

2.  Phillips County Detention Facility has a history of denying it's inmates medical attention as provided y the 8th Amendment.

3.  Phillips County Detention Center has a history of violating its' inmates due process rights as provided y the 4th and 14th Amendments.

4.  At the time of plaintiff's arrest and subsequent incarceration complained of, there was a pending civil action involving the very same defendant's in United States District Court for Eastern District of Arkansas,  civil action docket no: 2:09-CV-00100 JLH/D.

5.  The Defendant's have consistently harassed the plaintiff in retaliation for filing said Civil Suit.

6.  Marvel Police Department's officer's have a pattern harassment and violating its citizens Due Process Rights as provided y the 4th and 14th Amendments.

7.  On March 22, 20111 approximately 2:15 p.m. plaintiff, accompanied y his attorney, Mr. Clausey Myton Jr.  and Adrain Williams were stopped, locked in his driveway and detained, searched, harassed, for an extended period of time without legal authority or explanation by Phillips County Sheriff's Deputies Jeremy Henson, Benny Daniels, and David Lawman.

8.  During the illegal detention, Phillips County Sheriff , Ronnie White was somehow informed of plaintiff's disposition, and some time thereaftere, both Ronnie Whiter, and

David Lawman called Ronnie Hall, plaintiff's supervising parole officer, and did communicate to him that plaintiff did have pending criminal charges in an attempt to effectuate a violation of plaintiff's parole status, in retaliation for plaintiff's exercise of a protected right to petition the courts to aire his grievances. (See exhibit G)

9.  On March 22, 2011 plaintiff did not have any pending criminal charges in Phillips County Arkansas, as they stated above, defendant's White and lawman misrepresented the truth defaming plaintiff's character, thereby a conspiring to violate plaintiff's parole status in retaliation for filing lawsuit. Since they did not have any other reason to arrest the plaintiff after search, i.e. no drugs, weapons, or contraband was found, therefore this misinformation was defamatory in nature and intentionally intended to cause plaintiff harm in retaliation. (See plaintiff's parole violation report filed y Ronnie White, enclosed as exhibit H)

10.  On March 22, 2011 while plaintiff was being detained, in his own driveway, deputy Henson stated, "I know you got that lawsuit, and it's gonna end up costing you more than its worth" plaintiff then asked "am I under arrest, why ya'll harassing me?......I know my rights, why don't ya'll just leave me alone, cant you see I'm sick!" , Deputy Henson stated "just shut up and sit down!"

11.  On March 22, 2011 plaintiff was harrassed by Phillips County Sheriff's Deputies Henson, Lawman, and Daniels at his residence. Plaintiff was illegally detained in his driveway of his own home for an extended period of time which subsequently revealed to be a ploy, only to serve him with a civil summons. (See exhibit A).

12.  During the detention , the ploy was utilized, allowing time for Sheriff's Deputy Daniel's to drive Helena to secure a copy of said summons, plaintiff was further harassed, for

approximately (2)hours. During the time plaintiff was searched, and questioned as to his intentions on continuing to prosecute his prior civil action against their employers.

13. Deputy Henson and Deputy lawman both did harass plaintiff and stated, "I don't know what you trying to do, but what ever you think you gone get out of it its gone end up costing you more in the long run"

14. Deputy Daniels did serve plaintiff with a copy of the summons for exparte order of protection hearing. (see exhibit H),

15. Plaintiff did not violate the terms of the order. (H)

16. Contrary to defendants White, and Lawman's assertions on March 25, 2011 plaintiff's parole officer did not receive a copy of the "criminal charges" as clearly indicated in the violation report, but did send a copy of the expert order of protection, which is not a criminal charge and or device, therefor e defendant's assertions were falsely misleading. Defendant's actions were a malicious prosecution and a malicious because of legal process.(See exhibits B & H)

17. On March 27, 2011 approximately 10:30 am plaintiff did telephone Marvell Police Department to get their assistance in unlocking his vehicle, so he could go to the emergency room.

18. Shortly thereafter, Marvell Police Officer Timothy Harris badge #908 arrived at the plaintiff's mother's home at 601 Main Street Marvell, Arkansas. Upon arrival Marvell Police officer Timothy Harris averred "I forgot my slimjim, hold on, another officer is on the way with one."

19. Immediately, thereafter Phillips County Sheriffs Deputy Jeremy Henson badge # 311, arrived on the scene and told the plaintiff, "its kinda stupid to call the police to get your keys when you got warrants."

20. On March 27, 2007 plaintiff did not have any active warrants in Phillips County Arkansas. (See exhibit **F** NCIC printout)

21. Plaintiff did request to see a copy of the arrest warrant., deputy Henson did not produce a warrant.

22. Eventhough neither Officer Harris or Deputy Henson could produce an arrest warrant, none the less plaintiff was taken into custody.

23. On March 27, 2011 plaintiff requested that he be allowed to surrender the currency he had in his bank  bag to his mother, who violently protested and demanded a warrant and/or explanation. The defendant's provided neither.

24. On March 27, 2011 Plaintiff did inform officers that he did not have any of his prescribed medications and that he was enroute to the hospital at the time for emergency care.(See plaintiff's prescribed medical regimen enclosed as exhibit **D** ).

25. On March 27, 2011 Plaintiff did demand to e taken to the emergency room prior to being detained, yet Deputy Henson refused to do so.

26.  On March 27, 2011 Deputy Henson informed the plaintiff that Sheriff Ronnie White had been contacted and medical care would be provided immediately.

27.  On March 27, 2011 plaintiff did tell Deputy Henson that he felt a seizure coming on and was experiencing vertigo, and informed deputy Henson, and descrying  in detail each of his prescribed medications and its mandated regimen established over the past 13 years,  yet Deputy Henson contended "Oh, you will be alright, they will take care of you at the jail. I will personally make sure you make it to the hospital and get all your meds, "I've already spoken with the Sheriff, Ronnie White."

28. On March 27, 2011 Plaintiff then stated, "Ronnie White don't care if I live or die, please take me to the hospital."

29. On March 27, 2011 Plaintiff's medical regimen mandates a daily prescribed regimen consisting of approximately prescribed medications. (See exhibit D & E )

30. On March 27, 2011 plaintiff did not have any of his prescribed medications and did inform all the staff at the jail on March 27, 2011, of such!

31. On March 27, 2011 Defendant's refused to allow plaintiff his mandatory (1) one phone call, and the telephone in the cell lock was broken.

32. On March 27, 2011 All Defendant's were on notice of the potential harm posed on the plaintiff's health and welfare, and its proximate causation of their deliberate indifference to the plaintiff's serious medical needs.

33. On March 27, 2011, All defendants were put on notice of the potential complications, that would result from the denial of medical care and it's imminent danger to plaintiff's livelihood, yet they turned a blind eye towards it, thus they were deliberately indifferent to plaintiff's medical needs as well as his liberty interest rights.

34. On March 27, 2011 approximately 2:20pm plaintiff did seize, convulse, causing him to fall and injure his jaw, head, and breaking his wisdom tooth.

35. On March 27, 2011, Plaintiff did inform jailor Corrine, as soon as he arrived at the detention facility that he was experiencing medical distress, dizziness, excruciating pain, nauseated, dehydrated, shortness of breath, and vertigo.

36. On March 27, 2011 approximately 3:00 p.m. plaintiff did inform jailor James that he could not see clearly, his vision was blurred, he was experiencing chest pains, and his jaw and tooth were hurting causing him excruciating pain.

37. On March 27, 2011 approximately 4:30pm plaintiff did give jailor "Steve" a handwritten note in nature of a sickcall, descrying in detail all of his ailments, and medical regiment, as well as the injuries he sustained during the seizure. At the time

11

jaior "Steve" contrary to policies and procedures and against his better judgment, made a telephone call on his personal cellphone to the plaintiff's wife and informed her of the urgency of the situation, and that there was nothing he could do, so she should call the sheriff herself. (See Deputy Steves cell hone records ?), [1]

38. On March 28, 2011 approximately 6:15 am plaintiff again demanded that jailor Ruben Robinson provide him with an arrest warrant and notice of charges, and call a ail bondsman so he could post bond and go to the hospital, or take him to the emergency room for medical attention. Ruben Robinson refused to do so, thereby violating plaintiff's 4th, 14th, and 8th amendment Civil Rights. Additionally Ruben Robinson refused to accept the handwritten grievances and sickcall note provide to him at the time, thereby interfering with plaintiff's right to aire his grievances for redress, a violation of due process rights.

39. On March 28, 2011 approximately 9:30 am Deputy Jeremy Henson served plaintiff with a copy of an order continuing defendant's petition for order of protection, a civil device, and stated "here's your arrest warrant that you been crying about, so shut up!", then plaintiff informed Deputy Henson that he had experienced three seizures and had fallen and broke his tooth and had possibly broken his jaw, and had received no insulin in addition to the other (18) prescribed medications Deputy Henson had promised to provide. Additionally plaintiff informed Deputy Henson that he needed to go to doctor or hospital for a follow-up appointments well as procuring prescriptions for his mandatory medications. (See exhibit *page 6* )

---

[1] Plaintiff has requested pursuant to Rule 45, supoena duces tecm in order to procurre all cell phone records to corraorate his allegations and will be entered into evidence.

40. Plaintiff then demanded that he e admitted to ail, but Deputy Henson refused to do so, and again made reference to the civil process served upon the plaintiff earlier as justification for the plaintiff's extended restraint upon his liberty. (See exhibit *page 6* )

41. Plaintiff then did tell Deputy Henson and stated, 'I already been served with that petition, this is not a warrant, why are you holding me against my will on a civil process, I have not violated that order of protection , that's a civil case. This is not criminal, not bondable."

42. Deputy Henson then stated, "shut up, you ain't going nowhere til Tennessee come get you--they will take you to the hospital, if you need to go, I don't want to hear your lip!"

43. On March 28, 2011, plaintiff did not have an arrest warrant on him in Tennessee. (See NCIC report enclosed as exhibit *D*)

44. Plaintiff was unlawfully seized for Fourth Amendment purposes, which resulted in the injuries subsequently sustained, complained of today. BOTH BLATANT CIVIL RIGHTS VIOLATIONS.

45. The level of care and policies and provisions of the Phillips County Detention were violated resulting in the injuries complained of today, as well as the standards of care mandated y the National Diabetes Association for Diabetes Management in Correctional Institutions. (See Exhibit *A*)

46. On March 28, 2011 approximately 3:00pm plaintiff went into medical distress seized, violently convulsing, injuring his jaw and breaking his right rear lower wisdom tooth. *(See exhibit F)*

47. On March 28, 2011 Phillips County Detention Center's Administrator Lonnie Whitfield transported the plaintiff to Webber Family Clinic, instead of to the local emergency room as plaintiff requested. Upon arrival and assessment y Dr. David Webber, it was determined that plaintiff required emergency care, therefore defendant Whitfield was

ordered to transport the plaintiff Helena Regional Medical Center's Emergency Room immediately, and the defendant done so.

48. Upon arrival at the emergency room plaintiff was immediately given emergency medical care, but the level of care was inadequate, because separate defendant Doctor Arthur Levy refused to stabilize the plaintiff's emergency medical condition.(See medical records attached as exhibit B) He breached his professional duties, and responsibilities to the plaintiff on March 28, 2011. B)

49. Lonnie Whitfield transported plaintiff to the emergency roon and was placed in triage room, at the time plaintiff explained in detail to the nursing staff, that he was an inmate at the Phillips County Jail where there was no nurse, doctor, or healthcare provider and no medical supplies to maintain his care upon discharge. Additionally, plaintiff explained to Dr. Arthur Levy that he did not have "any" of his mandated prescribed medications at the jail, but most importantly, no insulin, seizure medications or heart medications. None the less, Dr. Levy REFUSED to write "any" prescriptions to maintain the plaintiff's health until his release from the Detention Facility. No other physician would have disregarded plaintiff's desperate pleas for care under these circumstances. Arthur Levy, MD reached his professional duties on March 28, 2011. (See exhibit C)

50. Defendant's Whitfield and Dr. Levy spoke at great lengths about the plaintiff's medical history, his inability to pay for the services and level of care needed, as well his pending extradition. Plaintiff interjected, "If you don't give me medication to take with me or write me a prescription, I will not get any medical attention when I get to jail because they don't got no nurse or doctor or nothing!". Dr. Levy responded "that's not any of my business, that's between you and the jail, Oh they will take good care of you." Plaintiff then again interjected, "no they ain't, please help me?" Then plaintiff and his

wife, Mrs. Carolyn A Anderson-Williams, overheard Dr. Levy, state something to the effect that he used to work in a correctional setting and *knows how those prisoners cab be, "I'm gonna hurry up and get him out of here so you can go home to your family."* (See attached affidavit as exhibit *C* ).

51. Separate defendants Whitfield, and Levy did conspire to deprive plaintiff of his Civil Rights, resulting in Dr. Levy's negligence, proforma, and inadequate medical care. Thus, they engaged in activities to deny the plaintiff's constitutional right to e free from cruel and unusual punishment by being deliberately indifferent to his serious medical needs. Constituting both the common-law action for medical negligence in addition to the 8th Amendment violation of the United States Constitution in triage room number (3) at the Helena Regional Medical Center on March 28, 2011.

52. On March 28, 2011 approximately 6:23 p.m. plaintiff was forcibly removed from HRMC without any medical supplies and/or medications, or prescriptions although he vehemently insisted and pleaded for prescriptions, samples, or any type of medicine to take with him. At the time plaintiff was still experiencing excruciating pain. (See medical records from HRMC for May 28, 2011 enclosed as exhibit *D* )[2]

53. Defendant Arthur Levy also refused to write any prescriptions for the (18) prescribed medications despite plaintiff's repeated requests for further treatment and prescriptions.(See exhibit *D#C#*

54. Plaintiff did inform Doctor Levy that he did not have any of the prescribed medications in the jail and that the jail staff would not provide them to him., defendant Levy none the less refused to assist the plaintiff maintain his health, even though he was aware of

---

[2] At this time plaintiff does not have resources to otain copies of the entire medical records ut hasd provided a astract and will sign any and all releases necessary upon request.

the plaintiff's medical ailments, history ,and potential complications resulting in further injury without treatment.  (See affidavit enclosed as exhibit D⁊E )

55. Defendant Levies actions were callous, cruel, and deliberately indifferent to the plaintiff's pronounced medical urgency and the current distress he was being treated for, yet defendant Levy recklessly intentionally disregarded plaintiff health, welfare and well-being under the circumstances here today.

56. Defendant's Levy's negligence and deliberate indifference to the plaintiff's medical needs resulted in plaintiff's subsequent pain and suffering at the detention facility from March 28-30, 2011, and plaintiff's subsequent mandatory extended inpatient stay in hospital from  March 30-31, 2011). (See doctor Ned Pillow's mandate enclosed as exhibit F page 3 & medical records from March 30-31, 2011 enclosed as exhibit G).

57. Plaintiff suffered needlessly because of Dr. Levy's negligence and deliberate indifference to his serious medical needs, resulting in plaintiff's extended stay in the hospital in inpatient status immediately preceeding Dr. Levy's negligent acts, as evidenced y Dr. Pillow's actions to undo thedamage done by Dr. Levy and Lonnie Whitfield..

58. On March 28, 2011 subsequent to being erroneously discharged from HMRC's ER when plaintiff was returned to Phillips County Detention Facility, the plaintiff again requested to e admitted to ail, but jail administrator Lonnie Whitfield again refused to do so, denying due process rights and stated, "you got no bond, we gonna hold you til they come get you, they got the warrant!" On march 28, 2011 plaintiff did not have an active warrant for his arrest from the State of Tennessee.(See NCIC report enclosed as exhibit R).

59. On March 28, 2011, at Helenena Regional Medical Center's Emergency Department, Dr. Arthur Levy and Phillips County Detention Facilities Administrator Lonnie Whitfield, did conspire to and did violate plaintiff's Civil Rights.

60. On March 29, 2011, Plaintiff did inform jailor James Bell, that his eye was swollen shut, he was in extreme pain, it was leaking both pus and blood, he was experiencing numbness on the left side of his face and pain in his right jaw and tooth, experiencing chronic fatigue, thirsty, had another seizure the night before, and numerous panic attacks. additionally he informed jailor Bell he had a follow-up appointment with Dr. Weber today- could he assist him? Jailor ell stated "no, there aint nothing I can do, I told you to just leave me out of it this time!" I then informed him that my tooth was split and jaw was swollen.

61. On March 29, 2011 approximately 10:30am plaintiff did inform jailor Bell that his nose was throbbing, he was in pain, could not breathe, and it was bleeding, and asked him to call somebody to help him--He stated,"No you can't get no pain meds, and no I will not call the sheriff or administrator for you!"

62. On March 29, 2011, approximately 10:35am  Plaintiff did request a legal phone call and was denied y officer ell, additionally Plaintiff did inform jailor Bell that his eye was shut, and continued to discharge, and that his blood sugar had to e extremely high, because his mouth was so dry, and approximately 3:50 pm additionally Plaintiff provided him with a copy of the discharge instructions and requested emergency assistance since he was in fact experiencing complications, and explained to him that his conditions would only get worse if not treated, and insisted that he talk to someone in authority, and jailor ell stated, "you can't talk to nobody but me, if you want some help, and I don't give a fuck, now go and tell the Judge that!"

63. On March 29, 2011 approximately 3:50 p.m. plaintiff did inform jailor Bell that his eye was swollen shut.

64. On March 29, 20101 plaintiff's wife, Mrs. Caroline A. Williams, made a telephone call to (870-338-0420), and spoke personally with Ronnie White, Phillips County Sherriff and described in detail plaintiff's medical regiment, and plaintiff's failing medical condition. (See affidavit enclosed as ehibit *B* and copy of Carolyn Williams, cellular telephone records )[3].

65. On March 30, 2011, Jail Administrator, Robert Blakely, against his superiors directives and against his better judgment, decided to release the plaintiff to his wife due to plaintiff's failing medical conditions.

66. On March 30, 2011, immediately upon being released from the Phillips County Detention Facility, plaintiff, collapsed and went into medical distress, and was rushed to Helena Regional Medical Center's Emergency Room, and was seen by Dr. Jeffery Ming, who immediately ordered plaintiff to be hospitalized for extended stay a on mandatory inpatient status. (See medical records from May 30, 2011 enclosed as exhibit *C*).

67. Compare and contrast the level of care provided by Dr.Jeffery Ming and Dr. Edward Pillow on March 30-31, 1022, the lack of medical care and disregard for the plaintiff's serious medical needs on the prior occasionof March 28, 2011, when no prescriptions weere written, You will see, know, and agree that Dr. Levy had to succumb to some type of undue influence, compromising his professional judgment, in erroneously discharging the plaintiff without stabilization and/or written prescriptions under the circumstances relative to the instant action, thereby deliberately causing the harm

---

[3] Plaintiff has requested pursuant to Rule 45, supoena duces tecm in order to procurre all cell phone records to corrobate his allegations and will be entered into evidence pursuant to coourt rules.

complained of today! This was a malicious act of gross negligence and medical malpractice to say the least!

WHEREFORE, plaintiff not only had to be hospitalized once, but twice resulting in an extended stay on inpatient status as a direct proximate result of the defendant's disregard and Deliberate Indifference to the plaintiff's Liberty Interests rights, as well as being Deliberately Indifferent to his Serious Medical Needs, All with the intent to harass and intimidate, in retaliation for plaintiff's decision to exercise a protected right. This type of misconduct is both appalling, apprehensive, and shocks the conscious of a civilized society.

There was an intentional disregard for the plaintiff's health, welfare, and well-being and was cruel and unusual punishment to say the least, a prime example at its WORST! Plaintiff has been damaged to a degree that is yet to be determined, has loss and sustained earning capacities, has undergone excruciating pain, sustained severe and permanent injury to his entire nervous system, mental health, internal organ system, excruciating pain and suffering and mental anguish in the past and will continue to undergo such pain and suffering in the future, has incurred medical expenses in the past and will continue to incur such expenses in the future. Additionally plaintiff' business, personal, and family affairs have been seriously disrupted and impaired, consequently resulting in a resulting in permanent imparment of maritial affairs, as evidenced by the now pending divorce filed by his newly wedded wife, Ms. Carolyn Anderson Williams. Thus, the damage has been done and plaintiff DEMANDS JUDGMENT against the defendants as follows:

## VII.  RELIEF REQUESTED:

A)  Trial by jury

B)     Awarding of compensatory damages in the amount of sity-nine thousand dollars (*$69,000.00*) against each defendant severally.

C)  Awarding of punitive Damages in the amount of ten-thousand dollars (*$10,000.00*) against each defendant severally.

D)     Awarding of Declaratory Relief, pronouncing the rights, duties, liabilities, and obligations of all parties involved.

E)  Awarding Injunctive Relief as follows:

  *Issue an injunction enjoining the defendant's from denying any of its inmates civil rights.

  *Issue an injunction enjoining the defendants from any and all retaliatory conduct towards the plaintiff.

  *Compelling the Phillips County Detention Center to provide the minimum standards of medical care,     thereby, meeting their statutory duties and obligation to provide an adequate medical care to its inmates.

  *Compel the Phillips County Detention Facility to hire a nurse on staff to conduct sick call for its inmates at least (5) days a week.

F) Grant the plaintiff's cause CLASS ACTION STATUS.

G) Awarding plaintiff of all costs associated with these proceedings.

H)  Any other just relief deemed necessary and proper.

Respectfully submitted,,

Al M.  Williams,pro se
P.O. Box 549/362773
Whiteville, TN 38075
713.420.3584
alwms1@hotmail.com

I (We) hereby certify under the penalty of perjury that the above petition is true to the best of                    our information, knowledge, and belief.

Signed this the  11  day of  November , 20___ .

state

(Signature of Plaintiff /Plaintiffs)



Darlene Mathew
Hardena
9-19 2012
11-1-11

# Diabetes Management in Correctional Institutions

AMERICAN DIABETES ASSOCIATION

At any given time, over 2 million people are incarcerated in prisons and jails in the U.S (1). It is estimated that nearly 80,000 of these inmates have diabetes, a prevalence of 4.8% (2). In addition, many more people pass through the corrections system in a given year. In 1998 alone, over 11 million people were released from prison to the community (1). The current estimated prevalence of diabetes in correctional institutions is somewhat lower than the overall U.S. prevalence of diabetes, perhaps because the incarcerated population is younger than the general population. The prevalence of diabetes and its related comorbidities and complications, however, will continue to increase in the prison population as current sentencing guidelines continue to increase the number of aging prisoners and the incidence of diabetes in young people continues to increase.

People with diabetes in correctional facilities should receive care that meets national standards. Correctional institutions have unique circumstances that need to be considered so that all standards of care may be achieved (3). Correctional institutions should have written policies and procedures for the management of diabetes and for training of medical and correctional staff in diabetes care practices. These policies must take into consideration issues such as security needs, transfer from one facility to another, and access to medical personnel and equipment, so that all appropriate levels of care are provided. Ideally, these policies should encourage or at least allow patients to self-manage their diabetes. Ultimately, diabetes management is dependent upon having access to needed medical personnel and equipment. Ongoing diabetes therapy is important in order to reduce the risk of later complications, including cardiovascular events, visual loss, renal failure, and amputation. Early identification and intervention for people with diabetes is also likely to reduce short-term risks for acute complications requiring transfer out of the facility, thus improving security.

This document provides a general set of guidelines for diabetes care in correctional institutions. It is not designed to be a diabetes management manual. More detailed information on the management of diabetes and related disorders can be found in the American Diabetes Association (ADA) Clinical Practice Recommendations, published each year in January as the first supplement to *Diabetes Care*, as well as the "Standards of Medical Care in Diabetes" (4) contained therein. This discussion will focus on those areas where the care of people with diabetes in correctional facilities may differ, and specific recommendations are made at the end of each section.

## INTAKE MEDICAL ASSESSMENT

### Reception screening

Reception screening should emphasize patient safety. In particular, rapid identification of all insulin-treated persons with diabetes is essential in order to identify those at highest risk for hypo- and hyperglycemia and diabetic ketoacidosis (DKA). All insulin-treated patients should have a capillary blood glucose (CBG) determination within 1–2 h of arrival. Signs and symptoms of hypo- or hyperglycemia can often be confused with intoxication or withdrawal from drugs or alcohol. Individuals with diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, combativeness, and diaphoresis, should have finger-stick blood glucose levels measured immediately.

### Intake screening

Patients with a diagnosis of diabetes should have a complete medical history and physical examination by a licensed health care provider with prescriptive authority in a timely manner. If one is not available on site, one should be consulted by those performing reception screening. The purposes of this history and physical examination are to determine the type of diabetes, current therapy, alcohol use, and behavioral health issues, as well as to screen for the presence of diabetes-related complications. The evaluation should review the previous treatment and the past history of both glycemic control and diabetes complications. It is essential that medication and medical nutrition therapy (MNT) be continued without interruption upon entry into the correctional system, as a hiatus in either medication or appropriate nutrition may lead to either severe hypo- or hyperglycemia that can rapidly progress to irreversible complications, even death.

### Intake physical examination and laboratory

All potential elements of the initial medical evaluation are included in Table 5 of the ADA's "Standards of Medical Care in Diabetes," referred to hereafter as the "Standards of Care" (4). The essential components of the initial history and physical examination are detailed in Fig. 1. Referrals should be made immediately if the patient with diabetes is pregnant.

### Recommendations

- Patients with a diagnosis of diabetes should have a complete medical history and undergo an intake physical examination by a licensed health professional in a timely manner. (E)
- Insulin-treated patients should have a CBG determination within 1–2 h of arrival. (E)
- Medications and MNT should be continued without interruption upon entry into the correctional environment. (E)

## SCREENING FOR DIABETES —

Consistent with the ADA Standards of Care, patients should be evaluated for diabetes risk factors at the intake physical and at appropriate times thereafter. Those

Originally approved 1989. Most recent revision, 2008.

Abbreviations: CBG, capillary blood glucose; DKA, diabetic ketoacidosis; GDM, gestational diabetes mellitus; MNT, medical nutrition therapy.

DOI: 10.2337/dc11-S075

© 2011 by the American Diabetes Association. Readers may use this article as long as the work is properly cited, the use is educational and not for profit, and the work is not altered. See http://creativecommons.org/licenses/by-nc-nd/3.0/ for details.

EXHIBIT A

*Correctional Institutions*

**Within 1-2 hrs.**

RECEPTION SCREENING

•Identify all inmates with diabetes currently using insulin therapy or at high risk for hypoglycemia
• ALL insulin treated patients: screening CBG and urine ketone test (as clinically indicated)
• Any patient exhibiting signs/symptoms consistent with hypoglycemia: immediate CBG
•Continue usual meal schedule and medication administration

**Within 2-24 hrs.**

INTAKE SCREENING

•Type and duration of diabetes          •Assess alcohol use
•Confirm current therapy                •Identify behavioral health issues
•Presence of complications                 such as depression, distress, suicidal ideation
•Family history                          •Assess prior diabetes educa
•Pregnancy screen in all female patients
 of childbearing age with diabetes

*All subjects with diabetes should have physician evaluation. If no physician available, physician should be consulted.*

**Within 2 hrs. – 2 weeks**

INTAKE PHYSICAL EXAM
LABORATORY – COMPLICATIONS SCREENING

<u>Complete exam including:</u>     <u>Laboratory studies:</u>
•Height, weight                 •A1C and glucose
•Blood pressure                 •Lipid Profile
•Eye (retinal) exam             •Microalbumin screen (Alb/Cr ratio)
•Cardiac                        •Urine ketones (as clinically indicated)
•Peripheral pulses              •AST/ALT (as clinically indicated)
•Foot and neurologic exam       •Creatinine (as clinically indicated)

**Figure 1**—*Essential components of the initial history and physical examination. Alb/Cr ratio, albumin-to-creatinine ratio; ALT, alanine aminotransferase; AST, aspartate aminotransferase.*

who are at high risk should be considered for blood glucose screening. If pregnant, a risk assessment for gestational diabetes mellitus (GDM) should be undertaken at the first prenatal visit. Patients with clinical characteristics consistent with a high risk for GDM should undergo glucose testing as soon as possible. High-risk women not found to have GDM at the initial screening and average-risk women should be tested between 24 and 28 weeks of gestation. For more detailed information on screening for both type 2 and gestational diabetes, see the ADA Position Statement "Screening for Type 2 Diabetes" (5) and the Standards of Care (4).

**MANAGEMENT PLAN**— Glycemic control is fundamental to the management of diabetes. A management plan to achieve normal or near-normal glycemia with an A1C goal of <7% should be developed for diabetes management at the time of initial medical evaluation. Goals should be individualized (4), and less stringent treatment goals may be appropriate for patients with a history of severe hypoglycemia, patients with limited life expectancies, elderly adults, and indi-

viduals with comorbid conditions (4). This plan should be documented in the patient's record and communicated to all persons involved in his/her care, including security staff. Table 1, taken from the ADA Standards of Care, provides a summary of recommendations for setting glycemic control goals for adults with diabetes.

People with diabetes should ideally receive medical care from a physician-coordinated team. Such teams include, but are not limited to, physicians, nurses, dietitians, and mental health professionals with expertise and a special interest in diabetes. It is essential in this collaborative and integrated team approach that individuals with diabetes assume as active a role in their care as possible. Diabetes self-management education is an integral component of care. Patient self-management should be emphasized, and the plan should encourage the involvement of the patient in problem solving as much as possible.

It is helpful to house insulin-treated patients in a common unit, if this is possible, safe, and consistent with providing access to other programs at the correc-

tional institution. Common housing not only can facilitate mealtimes and medication administration, but also potentially provides an opportunity for diabetes self-management education to be reinforced by fellow patients.

**NUTRITION AND FOOD SERVICES** — Nutrition counseling and menu planning are an integral part of the multidisciplinary approach to diabetes management in correctional facilities. A combination of education, interdisciplinary communication, and monitoring food intake aids patients in understanding their medical nutritional needs and can facilitate diabetes control during and after incarceration.

Nutrition counseling for patients with diabetes is considered an essential component of diabetes self-management. People with diabetes should receive individualized MNT as needed to achieve treatment goals, preferably provided by a registered dietitian familiar with the components of MNT for persons with diabetes.

Educating the patient, individually or in a group setting, about how carbohydrates and food choices directly affect di-

**Table 1—***Summary of recommendations for glycemic, blood pressure, and lipid control for most adults with diabetes*

| | |
|---|---|
| A1C | <7.0%* |
| Blood pressure | <130/80 mmHg |
| Lipids | |
| LDL cholesterol | <100 mg/dl (<2.6 mmol/l)† |

*Referenced to a nondiabetic range of 4.0–6.0% using a DCCT-based assay. †In individuals with overt CVD, a lower LDL cholesterol goal of <70 mg/dl (1.8 mmol/l), using a high dose of a statin, is an option.

abetes control is the first step in facilitating self-management. This education enables the patient to identify better food selections from those available in the dining hall and commissary. Such an approach is more realistic in a facility where the patient has the opportunity to make food choices.

The easiest and most cost-effective means to facilitate good outcomes in patients with diabetes is instituting a heart-healthy diet as the master menu (6). There should be consistent carbohydrate content at each meal, as well as a means to identify the carbohydrate content of each food selection. Providing carbohydrate content of food selections and/or providing education in assessing carbohydrate content enables patients to meet the requirements of their individual MNT goals. Commissaries should also help in dietary management by offering healthy choices and listing the carbohydrate content of foods.

The use of insulin or oral medications may necessitate snacks in order to avoid hypoglycemia. These snacks are a part of such patients' medical treatment plans and should be prescribed by medical staff.

Timing of meals and snacks must be coordinated with medication administration as needed to minimize the risk of hypoglycemia, as discussed more fully in the MEDICATION section of this document. For further information, see the ADA Position Statement "Nutrition Principles and Recommendations in Diabetes" (7).

## URGENT AND EMERGENCY ISSUES — All patients must have access to prompt treatment of hypo- and hyperglycemia. Correctional staff should be trained in the recognition and treatment of hypo- and hyperglycemia, and appropriate staff should be trained to administer glucagon. After such emergency care, patients should be referred for appropriate medical care to minimize risk of future decompensation.

Institutions should implement a policy requiring staff to notify a physician of all CBG results outside of a specified range, as determined by the treating physician (e.g., <50 or >350 mg/dl).

### Hyperglycemia
Severe hyperglycemia in a person with diabetes may be the result of intercurrent illness, missed or inadequate medication, or corticosteroid therapy. Correctional institutions should have systems in place to identify and refer to medical staff all patients with consistently elevated blood glucose as well as intercurrent illness.

The stress of illness in those with type 1 diabetes frequently aggravates glycemic control and necessitates more frequent monitoring of blood glucose (e.g., every 4–6 h). Marked hyperglycemia requires temporary adjustment of the treatment program and, if accompanied by ketosis, interaction with the diabetes care team. Adequate fluid and caloric intake must be ensured. Nausea or vomiting accompanied with hyperglycemia may indicate DKA, a life-threatening condition that requires immediate medical care to prevent complications and death. Correctional institutions should identify patients with type 1 diabetes who are at risk for DKA, particularly those with a prior history of frequent episodes of DKA. For further information see "Hyperglycemic Crisis in Diabetes" (8).

### Hypoglycemia
Hypoglycemia is defined as a blood glucose level <70 mg/dl. Severe hypoglycemia is a medical emergency defined as hypoglycemia requiring assistance of a third party and is often associated with mental status changes that may include confusion, incoherence, combativeness, somnolence, lethargy, seizures, or coma. Signs and symptoms of severe hypoglycemia can be confused with intoxication or withdrawal. Individuals with diabetes exhibiting signs and symptoms consistent with hypoglycemia, particularly altered mental status, agitation, and diaphoresis, should have their CBG levels checked immediately.

Security staff who supervise patients at risk for hypoglycemia (i.e., those on insulin or oral hypoglycemic agents) should be educated in the emergency response protocol for recognition and treatment of hypoglycemia. Every attempt should be made to document CBG before treatment. Patients must have immediate access to glucose tablets or other glucose-containing foods. Hypoglycemia can generally be treated by the patient with oral carbohydrates. If the patient cannot be relied on to keep hypoglycemia treatment on his/her person, staff members should have ready access to glucose tablets or equivalent. In general, 15–20 g oral glucose will be adequate to treat hypoglycemic events. CBG and treatment should be repeated at 15-min intervals until blood glucose levels return to normal (>70 mg/dl).

Staff should have glucagon for intramuscular injection or glucose for intravenous infusion available to treat severe hypoglycemia without requiring transport of the hypoglycemic patient to an outside facility. Any episode of severe hypoglycemia or recurrent episodes of mild to moderate hypoglycemia require reevaluation of the diabetes management plan by the medical staff. In certain cases of unexplained or recurrent severe hypoglycemia, it may be appropriate to admit the patient to the medical unit for observation and stabilization of diabetes management.

Correctional institutions should have systems in place to identify the patients at greater risk for hypoglycemia (i.e., those on insulin or sulfonylurea therapy) and to ensure the early detection and treatment of hypoglycemia. If possible, patients at greater risk of severe hypoglycemia (e.g., those with a prior episode of severe hypoglycemia) may be housed in units closer to the medical unit in order to minimize delay in treatment.

### Recommendations
- Train correctional staff in the recognition, treatment, and appropriate referral for hypo- and hyperglycemia. (E)
- Train appropriate staff to administer glucagon. (E)
- Train staff to recognize symptoms and signs of serious metabolic decompensation, and immediately refer the patient for appropriate medical care. (E)
- Institutions should implement a policy requiring staff to notify a physician of all CBG results outside of a specified range, as determined by the treating physician (e.g., <50 or >350 mg/dl). (E)
- Identify patients with type 1 diabetes who are at high risk for DKA. (E)

*Correctional Institutions*

**MEDICATION** — Formularies should provide access to usual and customary oral medications and insulins necessary to treat diabetes and related conditions. While not every brand name of insulin and oral medication needs to be available, individual patient care requires access to short-, medium-, and long-acting insulins and the various classes of oral medications (e.g., insulin secretagogues, biguanides, α-glucosidase inhibitors, and thiazolidinediones) necessary for current diabetes management.

Patients at all levels of custody should have access to medication at dosing frequencies that are consistent with their treatment plan and medical direction. If feasible and consistent with security concerns, patients on multiple doses of short-acting oral medications should be placed in a "keep on person" program. In other situations, patients should be permitted to self-inject insulin when consistent with security needs. Medical department nurses should determine whether patients have the necessary skill and responsible behavior to be allowed self-administration and the degree of supervision necessary. When needed, this skill should be a part of patient education. Reasonable syringe control systems should be established.

In the past, the recommendation that regular insulin be injected 30–45 min before meals presented a significant problem when "lock downs" or other disruptions to the normal schedule of meals and medications occurred. The use of multiple-dose insulin regimens using rapid-acting analogs can decrease the disruption caused by such changes in schedule. Correctional institutions should have systems in place to ensure that rapid-acting insulin analogs and oral agents are given immediately before meals if this is part of the patient's medical plan. It should be noted however that even modest delays in meal consumption with these agents can be associated with hypoglycemia. If consistent access to food within 10 min cannot be ensured, rapid-acting insulin analogs and oral agents are approved for administration during or immediately after meals. Should circumstances arise that delay patient access to regular meals following medication administration, policies and procedures must be implemented to ensure the patient receives appropriate nutrition to prevent hypoglycemia.

Both continuous subcutaneous insulin infusion and multiple daily insulin injection therapy (consisting of three or more injections a day) can be effective means of implementing intensive diabetes management with the goal of achieving near-normal levels of blood glucose (9). While the use of these modalities may be difficult in correctional institutions, every effort should be made to continue multiple daily insulin injection or continuous subcutaneous insulin infusion in people who were using this therapy before incarceration or to institute these therapies as indicated in order to achieve blood glucose targets.

It is essential that transport of patients from jails or prisons to off-site appointments, such as medical visits or court appearances, does not cause significant disruption in medication or meal timing. Correctional institutions and police lock-ups should implement policies and procedures to diminish the risk of hypo- and hyperglycemia by, for example, providing carry-along meals and medication for patients traveling to off-site appointments or changing the insulin regimen for that day. The availability of prefilled insulin "pens" provides an alternative for off-site insulin delivery.

**Recommendations**
- Formularies should provide access to usual and customary oral medications and insulins to treat diabetes and related conditions. (E)
- Patients should have access to medication at dosing frequencies that are consistent with their treatment plan and medical direction. (E)
- Correctional institutions and police lock-ups should implement policies and procedures to diminish the risk of hypo- and hyperglycemia during off-site travel (e.g., court appearances). (E)

## ROUTINE SCREENING FOR AND MANAGEMENT OF DIABETES COMPLICATIONS —
All patients with a diagnosis of diabetes should receive routine screening for diabetes-related complications, as detailed in the ADA Standards of Care (4). Interval chronic disease clinics for persons with diabetes provide an efficient mechanism to monitor patients for complications of diabetes. In this way, appropriate referrals to consultant specialists, such as optometrists/ophthalmologists, nephrologists, and cardiologists, can be made on an as-needed basis and interval laboratory testing can be done.

The following complications should be considered.

- Foot care: Recommendations for foot care for patients with diabetes and no history of an open foot lesion are described in the ADA Standards of Care. A comprehensive foot examination is recommended annually for all patients with diabetes to identify risk factors predictive of ulcers and amputations. Persons with an insensate foot, an open foot lesion, or a history of such a lesion should be referred for evaluation by an appropriate licensed health professional (e.g., podiatrist or vascular surgeon). Special shoes should be provided as recommended by licensed health professionals to aid healing of foot lesions and to prevent development of new lesions.
- Retinopathy: Annual retinal examinations by a licensed eye care professional should be performed for all patients with diabetes, as recommended in the ADA Standards of Care. Visual changes that cannot be accounted for by acute changes in glycemic control require prompt evaluation by an eye care professional.
- Nephropathy: An annual spot urine test for determination of microalbumin-to-creatinine ratio should be performed. The use of ACE inhibitors or angiotensin receptor blockers is recommended for all patients with albuminuria. Blood pressure should be controlled to <130/80 mmHg.
- Cardiac: People with type 2 diabetes are at a particularly high risk of coronary artery disease. Cardiovascular disease risk factor management is of demonstrated benefit in reducing this complication in patients with diabetes. Blood pressure should be measured at every routine diabetes visit. In adult patients, test for lipid disorders at least annually and as needed to achieve goals with treatment. Use aspirin therapy (75–162 mg/day) in all adult patients with diabetes and cardiovascular risk factors or known macrovascular disease. Current national standards for adults with diabetes call for treatment of lipids to goals of LDL ≤100, HDL >40, triglycerides <150 mg/dl and blood pressure to a level of <130/80 mmHg.

## MONITORING/TESTS OF GLYCEMIA — Monitoring of CBG is a strategy that allows caregivers and peo-

ple with diabetes to evaluate diabetes management regimens. The frequency of monitoring will vary by patients' glycemic control and diabetes regimens. Patients with type 1 diabetes are at risk for hypoglycemia and should have their CBG monitored three or more times daily. Patients with type 2 diabetes on insulin need to monitor at least once daily and more frequently based on their medical plan. Patients treated with oral agents should have CBG monitored with sufficient frequency to facilitate the goals of glycemic control, assuming that there is a program for medical review of these data on an ongoing basis to drive changes in medications. Patients whose diabetes is poorly controlled or whose therapy is changing should have more frequent monitoring. Unexplained hyperglycemia in a patient with type 1 diabetes may suggest impending DKA, and monitoring of ketones should therefore be performed.

Glycated hemoglobin (A1C) is a measure of long-term (2- to 3-month) glycemic control. Perform the A1C test at least two times a year in patients who are meeting treatment goals (and who have stable glycemic control) and quarterly in patients whose therapy has changed or who are not meeting glycemic goals.

Discrepancies between CBG monitoring results and A1C may indicate a hemoglobinopathy, hemolysis, or need for evaluation of CBG monitoring technique and equipment or initiation of more frequent CBG monitoring to identify when glycemic excursions are occurring and which facet of the diabetes regimen is changing.

In the correctional setting, policies and procedures need to be developed and implemented regarding CBG monitoring that address the following.

- infection control
- education of staff and patients
- proper choice of meter
- disposal of testing lancets
- quality control programs
- access to health services
- size of the blood sample
- patient performance skills
- documentation and interpretation of test results
- availability of test results for the health care provider (10)

**Recommendations**
- In the correctional setting, policies and procedures need to be developed and implemented to enable CBG monitor-

ing to occur at the frequency necessitated by the individual patient's glycemic control and diabetes regimen. (E)
- A1C should be checked every 3–6 months. (E)

## SELF-MANAGEMENT EDUCATION — Self-management education is the cornerstone of treatment for all people with diabetes. The health staff must advocate for patients to participate in self-management as much as possible. Individuals with diabetes who learn self-management skills and make lifestyle changes can more effectively manage their diabetes and avoid or delay complications associated with diabetes. In the development of a diabetes self-management education program in the correctional environment, the unique circumstances of the patient should be considered while still providing, to the greatest extent possible, the elements of the "National Standards for Diabetes Self-Management Education" (11). A staged approach may be used depending on the needs assessment and the length of incarceration. Table 2 sets out the major components of diabetes self-management education. Survival skills should be addressed as soon as possible; other aspects of education may be provided as part of an ongoing education program.

Ideally, self-management education is coordinated by a certified diabetes educator who works with the facility to develop polices, procedures, and protocols to ensure that nationally recognized education guidelines are implemented. The educator is also able to identify patients who need diabetes self-management education, including an assessment of the patients' medical, social, and diabetes histories; diabetes knowledge, skills, and behaviors; and readiness to change.

## STAFF EDUCATION — Policies and procedures should be implemented to ensure that the health care staff has adequate knowledge and skills to direct the management and education of persons with diabetes. The health care staff needs to be involved in the development of the correctional officers' training program. The staff education program should be at a lay level. Training should be offered at least biannually, and the curriculum should cover the following.

- what diabetes is
- signs and symptoms of diabetes
- risk factors
- signs and symptoms of, and emergency response to, hypo- and hyperglycemia
- glucose monitoring
- medications
- exercise
- nutrition issues including timing of meals and access to snacks

**Recommendations**
- Include diabetes in correctional staff education programs. (E)

## ALCOHOL AND DRUGS — Patients with diabetes who are withdrawing from drugs and alcohol need special consideration. This issue particularly affects initial police custody and jails. At an intake facility, proper initial identification and assessment of these patients are critical. The presence of diabetes may complicate detoxification. Patients in need of complicated detoxification should be referred to a facility equipped to deal with high-risk detoxification. Patients with diabetes should be educated in the risks involved with smoking. All inmates should be advised not to smoke. Assistance in smoking cessation should be provided as practical.

## TRANSFER AND DISCHARGE — Patients in jails may be housed for a short period of time before being transferred or released, and it is not unusual for patients in prison to be transferred within the system several times during their incarceration. One of the many challenges that health care providers face working in the correctional system is how to best collect and communicate important health care information in a timely manner when a patient is in initial police custody, is jailed short term, or is transferred from facility to facility. The importance of this communication becomes critical when the patient has a chronic illness such as diabetes.

Transferring a patient with diabetes from one correctional facility to another requires a coordinated effort. To facilitate a thorough review of medical information and completion of a transfer summary, it is critical for custody personnel to provide medical staff with sufficient notice before movement of the patient.

Before the transfer, the health care staff should review the patient's medical record and complete a medical transfer

*Correctional Institutions*

Table 2—*Major components of diabetes self-management education*

| Survival skills | Daily management issues |
|---|---|
| • hypo-/hyperglycemia | • disease process |
| • sick day management | • nutritional management |
| • medication | • physical activity |
| • monitoring | • medications |
| • foot care | • monitoring |
| | • acute complications |
| | • risk reduction |
| | • goal setting/problem solving |
| | • psychosocial adjustment |
| | • preconception care/pregnancy/gestational diabetes management |

summary that includes the patient's current health care issues. At a minimum, the summary should include the following.

• the patient's current medication schedule and dosages
• the date and time of the last medication administration
• any recent monitoring results (e.g., CBG and A1C)
• other factors that indicate a need for immediate treatment or management at the receiving facility (e.g., recent episodes of hypoglycemia, history of severe hypoglycemia or frequent DKA, concurrent illnesses, presence of diabetes complications)
• information on scheduled treatment/appointments if the receiving facility is responsible for transporting the patient to that appointment
• name and telephone/fax number of a contact person at the transferring facility who can provide additional information, if needed

The medical transfer summary, which acts as a quick medical reference for the receiving facility, should be transferred along with the patient. To supplement the flow of information and to increase the probability that medications are correctly identified at the receiving institution, sending institutions are encouraged to provide each patient with a medication card to be carried by the patient that contains information concerning diagnoses, medication names, dosages, and frequency. Diabetes supplies, including diabetes medication, should accompany the patient.

The sending facility must be mindful of the transfer time in order to provide the patient with medication and food if needed. The transfer summary or medical record should be reviewed by a health

care provider upon arrival at the receiving institution.

Planning for patients' discharge from prisons should include instruction in the long-term complications of diabetes, the necessary lifestyle changes and examinations required to prevent these complications, and, if possible, where patients may obtain regular follow-up medical care. A quarterly meeting to educate patients with upcoming discharges about community resources can be valuable. Inviting community agencies to speak at these meetings and/or provide written materials can help strengthen the community link for patients discharging from correctional facilities.

Discharge planning for the patients with diabetes should begin 1 month before discharge. During this time, application for appropriate entitlements should be initiated. Any gaps in the patient's knowledge of diabetes care need to be identified and addressed. It is helpful if the patient is given a directory or list of community resources and if an appointment for follow-up care with a community provider is made. A supply of medication adequate to last until the first postrelease medical appointment should be provided to the patient upon release. The patient should be provided with a written summary of his/her current heath care issues, including medications and doses, recent A1C values, etc.

**Recommendations**
• For all interinstitutional transfers, complete a medical transfer summary to be transferred with the patient. (E)
• Diabetes supplies and medication should accompany the patient during transfer. (E)
• Begin discharge planning with adequate lead time to insure continuity of

care and facilitate entry into community diabetes care. (E)

## SHARING OF MEDICAL INFORMATION AND RECORDS — Practical considerations may prohibit obtaining medical records from providers who treated the patient before arrest. Intake facilities should implement policies that *1*) define the circumstances under which prior medical records are obtained (e.g., for patients who have an extensive history of treatment for complications); *2*) identify person(s) responsible for contacting the prior provider; and *3*) establish procedures for tracking requests.

Facilities that use outside medical providers should implement policies and procedures for ensuring that key information (e.g., test results, diagnoses, physicians' orders, appointment dates) is received from the provider and incorporated into the patient's medical chart after each outside appointment. The procedure should include, at a minimum, a means to highlight when key information has not been received and designation of a person responsible for contacting the outside provider for this information.

All medical charts should contain CBG test results in a specified, readily accessible section and should be reviewed on a regular basis.

## CHILDREN AND ADOLESCENTS WITH DIABETES — Children and adolescents with diabetes present special problems in disease management, even outside the setting of a correctional institution. Children and adolescents with diabetes should have initial and follow-up care with physicians who are experienced in their care. Confinement increases the difficulty in managing diabetes in children and adolescents, as it does in adults with diabetes. Correctional authorities also have different legal obligations for children and adolescents.

**Nutrition and activity**
Growing children and adolescents have greater caloric/nutritional needs than adults. The provision of an adequate amount of calories and nutrients for adolescents is critical to maintaining good nutritional status. Physical activity should be provided at the same time each day. If increased physical activity occurs, addi-

tional CBG monitoring is necessary and additional carbohydrate snacks may be required.

**Medical management and follow-up**
Children and adolescents who are incarcerated for extended periods should have follow-up visits at least every 3 months with individuals who are experienced in the care of children and adolescents with diabetes. Thyroid function tests and fasting lipid and microalbumin measurements should be performed according to recognized standards for children and adolescents (12) in order to monitor for autoimmune thyroid disease and complications and comorbidities of diabetes.

Children and adolescents with diabetes exhibiting unusual behavior should have their CBG checked at that time. Because children and adolescents are reported to have higher rates of nocturnal hypoglycemia (13), consideration should be given regarding the use of episodic overnight blood glucose monitoring in these patients. In particular, this should be considered in children and adolescents who have recently had their overnight insulin dose changed.

**PREGNANCY** — Pregnancy in a woman with diabetes is by definition a high-risk pregnancy. Every effort should be made to ensure that treatment of the pregnant woman with diabetes meets accepted standards (14,15). It should be noted that glycemic standards are more stringent, the details of dietary management are more complex and exacting, insulin is the only antidiabetic agent approved for use in pregnancy, and a number of medications used in the management of diabetic comorbidities are known to be teratogenic and must be discontinued in the setting of pregnancy.

**SUMMARY AND KEY POINTS** — People with diabetes should receive care that meets national standards. Being incarcerated does not change these standards. Patients must have access to medication and nutrition needed to manage their disease. In patients who do not meet treatment targets, medical and behavioral plans should be adjusted by health care professionals in collaboration with the prison staff. It is critical for correctional institutions to identify particularly high-risk patients in need of more intensive evaluation and therapy, including pregnant women, patients with advanced complications, a history of repeated severe hypoglycemia, or recurrent DKA.

A comprehensive, multidisciplinary approach to the care of people with diabetes can be an effective mechanism to improve overall health and delay or prevent the acute and chronic complications of this disease.

**Acknowledgments** — The following members of the American Diabetes Association/National Commission on Correctional Health Care Joint Working Group on Diabetes Guidelines for Correctional Institutions contributed to the revision of this document: Daniel L. Lorber, MD, FACP, CDE (chair); R. Scott Chavez, MPA, PA-C; Joanne Dorman, RN, CDE, CCHP-A; Lynda K. Fisher, MD; Stephanie Guerken, RD, CDE; Linda B. Haas, CDE, RN; Joan V. Hill, CDE, RD; David Kendall, MD; Michael Puisis, DO; Kathy Salomone, CDE, MSW, APRN; Ronald M. Shansky, MD, MPH; and Barbara Wakeen, RD, LD.

**References**
1. National Commission on Correctional Health Care: *The Health Status of Soon-to-Be Released Inmates: A Report to Congress.* Vol. 1. Chicago, NCCHC, 2002
2. Hornung CA, Greifinger RB, Gadre S: *A Projection Model of the Prevalence of Selected Chronic Diseases in the Inmate Population.* Vol. 2. Chicago, NCCHC, 2002, p. 39–56
3. Puisis M: Challenges of improving quality in the correctional setting. In *Clinical Practice in Correctional Medicine.* St. Louis, MO, Mosby-Yearbook, 1998, p. 16–18
4. American Diabetes Association: Standards of medical care in diabetes—2011 (Position Statement). *Diabetes Care* 34 (Suppl. 1):S11–S61, 2011
5. American Diabetes Association: Screening for type 2 diabetes (Position Statement). *Diabetes Care* 27 (Suppl. 1):S11–S14, 2004
6. Krauss RM, Eckel RH, Howard B, Appel LJ, Daniels SR, Deckelbaum RJ, Erdman JW Jr, Kris-Etherton P, Goldberg IJ, Kotchen TA, Lichtenstein AH, Mitch WE, Mullis R, Robinson K, Wylie-Rosett J, St Jeor S, Suttie J, Tribble DL, Bazzarre TL: American Heart Association Dietary Guidelines: revision 2000. a statement for healthcare professionals from the Nutrition Committee of the American Heart Association. *Stroke* 31:2751–2766, 2000
7. American Diabetes Association: Nutrition recommendations and interventions for diabetes (Position Statement). *Diabetes Care* 31 (Suppl. 1):S61–S78, 2008
8. American Diabetes Association: Hyperglycemic crisis in diabetes (Position Statement). *Diabetes Care* 27 (Suppl. 1):S94–S102, 2004
9. American Diabetes Association: Continuous subcutaneous insulin infusion (Position Statement). *Diabetes Care* 27 (Suppl. 1):S110, 2004
10. American Diabetes Association: Tests of glycemia in diabetes (Position Statement). *Diabetes Care* 27 (Suppl. 1):S91–S93, 2004
11. American Diabetes Association: National standards for diabetes self-management education (Standards and Review Criteria). *Diabetes Care* 31 (Suppl. 1):S97–S104, 2008
12. International Society for Pediatric and Adolescent Diabetes: *Consensus Guidelines 2000: ISPAD Consensus Guidelines for the Management of Type 1 Diabetes Mellitus in Children and Adolescents.* Zeist, Netherlands, Medical Forum International, 2000, p. 116, 118
13. Kaufman FR, Austin J, Neinstein A, Jeng L, Halyorson M, Devoe DJ, Pitukcheewanont P: Nocturnal hypoglycemia detected with the continuous glucose monitoring system in pediatric patients with type 1 diabetes. *J Pediatr* 141:625–630, 2002
14. American Diabetes Association: Gestational diabetes mellitus (Position Statement). *Diabetes Care* 27 (Suppl. 1):S88–S90, 2004
15. Jovanovic L (Ed.): *Medical Management of Pregnancy Complicated by Diabetes.* 4th ed. Alexandria, VA, American Diabetes Association, 2009

2

### SWORN    AFFIDAVIT

I, Carolyn A. Williams, affiant do hereby solemnly swear and affirm pursuant to penalty of perjury based upon my own personal knowledge aver to the following facts:

During the period of time when my husband, Al M. Williams, was incarcerated in the phillips County Detention Center, from on or about March 26 thru March 31, 2011, that I made several telephone calls to Sheriff Ronnie White @ 870.338.0420 and informed him on March 27, 2011 that I had recieved a call from the jailor telling me that my husband was in medical distress and having seizures. I also told Sheriff White that my husband required insulin injection 4/times a day and constant monitoring of his blood sugar, and hypertension, hyperlipedemia medicines, and anti-psychotic medications, as well as his seizure medicine. Sheriff White stated "he can't get out and that is Tennessee's problem. He also refused to allow me to post bond, or to take my husband to the hospital for his kidney problems.

SWORN AND SUBSCRIBED, BEFORE ME a _____, a notary public on this _____ day of October 2011.

affiant, _Carolyn A Smith Williams_

Carolyn A. Williams
1003 FC 300 RD
W.Helena, AR 72390
870.995.7764

State of Arkansas
County of Phillips
On this the ___ ᵗʰ day of Oct 20__, before me, Cathy Casteel, the undersigned notary, personally appeared Carolyn Smith Williams satisfactorily proven with Ark ID# _____ to be the person whose name is subscribed to the within instrument and acknowledged that he executed the same for the purposes therein contained. In witness whereof I hereunto set my hand and official seal.

_Cathy Casteel_
Notary Public    My commission expires: 3-24-2016

OFFICIAL SEAL
CATHY CASTEEL
No. 12317464
PHILLIPS COUNTY
My Commission Expires 3-24-2016

EXHIBIT
B)

## SWORN AFFIDAVIT

I, Affiant, Carolyn A. Anderson-Williams, being first duly sworn make the following averments pursuant to penalty of perjury to the following facts:

On March 20, 2011,I was physically present in Helena Regional Medical Center's Emergency Department at triage door number (3) three, visiting my husband , Al M.Williams,  who was in medical distress, under police custody, when I overheard Phillips County  Detention Center's Administrator talking to Emergency Room Physician Arthur Levy, MD stae, " I used to work in a correctional setting and know how these prisoners can be, so I am gonna go ahead and get him out of here so you can get back and go home to your family." Then I overheard my husband tell Dr.Levy "Would you pleasure bring my blood sugar down and stop the seizures too, and please write me a prescription for my blood pressure medicine and my seizure medicine, because I been having seizures at the jail, and I fell and broke my tooth on the table." " If you don't help me I won't get no help at the jail"and Dr.Levy said, " it ain't my job and I can't worry about what happens to you at the jail." Then my husband said," you are my only hope, please help me because it ain't no doctor, nurse, or nobody at the jail and ain't nobody gone give me no more insulin, or any of my prescribed medications." And Dr.Levy said , "that's too bad, you got go, and they started laughing amounts themselves, and he said "bye-bye!"

Then I watched Lonnie Whitfield shackle up my husband and help him out to the squad car without any medicne, and or prescriptions, despite my husbands pleas for help.

SWORN AND SUBSCRIBED BEFORE ME _Angela Lott_ ; a NOTARY PUBLIC on this _26_ day of August 2011.

X _Carolyn A. Williams_ , Affiant

**Carolyn A. Anderson-Williams**



EXHIBIT

C



# Christ Community
## HEALTH SERVICES

Name: Williams, Al    DOB: 11 / 17 / 69    ALLERGIES: Codiene, Sulfa

#/RF/R – RX, D – Dispensed, C – Called in

| Start Date | Medication | Date of Rx> Dose | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Novolin 70/30 | 36 am 22 pm | #8 Past | ↑ 40am ↑ 35pm | | | | |
| | Prilosec (omepr.) | 20 gd | #30 | #30. | | | | |
| | Haldol | 20 | MH | MH | | | | |
| | Clonidine | Δ 3 BID | M# | Hold | | | | |
| | Renexon | | MH | MH | | | | |
| | Cogentin | | MH | MH Δ | | | | |
| | Vistaril | | MH | DC | | | | |
| | Glyburide | 5y BID | #Δ | | | | | |
| | Simvastatin | 80 gd | #30 | #30 | | | | |
| | Verapamil | 240 g SR | Rx | Hold | | | | |
| | HCTZ | 25 g | #30 | #30 | | | | |
| | Neurontin | 800 g TID | #98 RX | RX #8 | | | | |
| | Enalapril | | A | | | | | |
| | Lisinopril | 20 y | #30 | #30 | | | | |
| | Doxepin | | M# | DC | | | | |
| | Metformin | 500 BID | #60 | ✓ | | | | |
| | Benadryl | | | MA | | | | |
| | Dilantin | 300 ghr | RX | #180 | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Form 4008-00


EXHIBIT
D

# HELENA REGIONAL MEDICAL CENTER

## GENERAL INFORMATION

```
PT NAME:  WILLIAMS AL                    ACCT#:0898265      VIP: N              CONFIDENTIAL: Y
ADMIT DATE/TIME: 03/28/11 15:48                             REC TYPE:           MR#: 000130631
DISCHARGE DATE/TIME:  03/28/11  15:48                       LOCATION:           SERV: EOP
ADMIT MD:  WEBBER DAVID DO                                  ROOM/BED:    /      CLERK:MNA
ER/ATTEND MD: LEVY ARTHUR                                                       PT TYPE/ACCOM: E
PCP MD: WEBBER DAVID DO
REASON FOR VISIT:                                           ADM PRIORITY:       MRSA/ISOLATION:
PAIN MUTIPLE SITES NO KNOWN INJURY                          ADM SOURCE: 8
COMMENTS:
```

## PATIENT DEMOGRAPHICS

```
STREET: 1003 PC 300 RD              DOB/AGE:11/17/1969  41       SS#: 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
CITY:   WEST HELENA      AR         SEX: M                       RELIG: U
ZIP:    72390                       MAR STATUS: S                BIRTH PLACE:
HOME PHONE: (870)995-7764
```

| NEXT OF KIN | PERSON TO NOTIFY | VISIT HISTORY |
|---|---|---|
| RELAT TO PT: 01 SPOUSE<br>NAME:   WILLIAMS CAROLYN<br>STREET:  UNKNOWN<br>CITY/ST: MARVELL        AR<br>ZIP:     72366<br>H- (870)995-7764 W- (000)    - | RELAT TO PT: 32 MOTHER<br>NAME:   CHESTNUT DOROTHY<br>STREET:<br>CITY/ST:<br>ZIP:<br>H-(870)829-1141  W-(000)    - | LST DATE: 03/21/11<br>LST SRVCD: EOP<br><br><br>OCCUR CD:  11<br>DT OF INJ: 03/28/11 |

## EMPLOYER & GUARANTOR INFORMATION

```
PT EMPLOYER:                GUARANTOR:WILLIAMS AL          SS#: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
ADDRESS:                    GRNTOR EMP:
CITY/STATE:                 ADDRESS:  1003 PC 300 RD
ZIP CODE:                   CITY/STATE: WEST HELENA        AR
PHONE:                      ZIP CODE:   72390
                            PHONE:   (870)995-7764
                            REL TO PAT: 18  SELF
```

## INSURANCE COVERAGE INFORMATION

```
PRIM INS:  SELF PAY O P          F/C: S         SECD INS:
ADDRESS:   1003 PC 300                          ADDRESS:

CITY/STATE:WEST HELENA        AR                CITY/STATE:
ZIP CODE:  72390                                ZIP CODE:
PHONE:     (870)995-7764                        PHONE:

POLICY#:   430395344                            POLICY#:
GROUP#:                                         GROUP#:
AUTH#:                                          AUTH#:
EMPLOYER:                                       EMPLOYER:
INSUREDS NAME: WILLIAMS AL                      INSUREDS NAME:
REL TO PAT:  18 SELF                            REL TO PAT:
DOB: 11/17/1969                                 DOB:
```

| ER HMO AUTHORIZATION | YES _____ NO _____ | ER HMO AUTHORIZATION | YES _____ NO _____ |
|---|---|---|---|
| BY _____ | TIME _____ | BY _____ | TIME _____ |
| O.O.T _____ | PGR PROTOCAL _____ | O.O.T _____ | PGR PROTOCAL _____ |

```
ASSEMBLED _____          DIAGNOSIS CODES                    PROCEDURE CODES

CODED/ABSTRACTED _____     ____ ____ ____ ____          ____ ____ ____ ____

ANALYZED _____       ____ ____ ____ ____          ____ ____ ____ ____
```





Helena Regional Medical Center
1801 Martin Luther King Dr, Helena, AR 72342
1-870-338-5800
**Patient: WILLIAMS, AL  DOB: 11/17/1969  Patient #: 898265  MRN: 000130631  Date In: 03/28/2011**
**Discharge Instructions**

You have been diagnosed and treated by a specialist in Emergency Medical Care.
These discharge instructions have been prepared for you in order that you bett⟨
understand your condition, and how this condition may affect you now that you ⟨
been discharged from our emergency room. Please read these instructions carefu⟨
and do not hesitate to call us if you have any questions.

Your emergency care provider today was: **LEVY, ARTHUR, MD**

### Special Instructions

Return to jail, follow up with Dr. Webber in office in 1-2 days for prescripti⟨
for all meedications. Return to ER for emergent needs. Follow up with optometr⟨
for recheck of eyes in 2-3 days.


Referred to:

Webber, David, DO
Phone: (870) 338-9244
504 Pecan Helena, AR 72342


Follow up in 1 days

The exam and treatment you received today has been provided on an emergency ba⟨
only. This is not a substitute for complete medical care. You, not Helena Regi⟨
Medical Center, are responsible for arranging and obtaining follow-up care wit⟨
doctor or other healthcare provider, which includes making arrangements for
payment. If your problem worsens or new symptoms appear and you are unable to
arrange prompt follow-up care, call or return to this emergency room.

If you had EKG's or X-rays done in the Emergency Department, they will be revi⟨
by a specialist. If their interpretation is different from the Emergency care
provider, you or your physician will be notified.

If you had cultures done, results are usually available within 48-72 hours. If
results indicate a need for re-evaluation or change in treatment, you will be
notified.

Helena Regional Medical Center
1801 Martin Luther King Dr, Helena, AR 72342
1-870-338-5800
**Patient: WILLIAMS, AL   DOB: 11/17/1969   Patient #: 898265   MRN: 000130631   Date In: 03/28/2011**
**Discharge Instructions**

You have been diagnosed and treated by a specialist in Emergency Medical Care.
These discharge instructions have been prepared for you in order that you bette
understand your condition, and how this condition may affect you now that you h
been discharged from our emergency room. Please read these instructions carefu:
and do not hesitate to call us if you have any questions.

Your emergency care provider today was: **LEVY, ARTHUR, MD**

### Special Instructions

Return to jail, follow up with Dr. Webber in office in 1-2 days for prescripti
for all meedications. Return to ER for emergent needs. Follow up with optometr
for recheck of eyes in 2-3 days.


Referred to:

Webber, David, DO
Phone: (870)338-9244
504 Pecan Helena, AR 72342


Follow up in 1 days

The exam and treatment you received today has been provided on an emergency ba:
only. This is not a substitute for complete medical care. You, not Helena Regio
Medical Center, are responsible for arranging and obtaining follow-up care with
doctor or other healthcare provider, which includes making arrangements for
payment. If your problem worsens or new symptoms appear and you are unable to
arrange prompt follow-up care, call or return to this emergency room.

If you had EKG's or X-rays done in the Emergency Department, they will be revie
by a specialist. If their interpretation is different from the Emergency care
provider, you or your physician will be notified.

If you had cultures done, results are usually available within 48-72 hours. If
results indicate a need for re-evaluation or change in treatment, you will be
notified.

Helena Regional Medical Center
1801 Martin Luther King Dr, Helena, AR 72342
1-870-338-5800
**Patient: WILLIAMS, AL   DOB: 11/17/1969   Patient #: 898265   MRN: 000130631   Date In: 03/28/2011**
**Discharge Instructions**

## HYPERGLYCEMIA

HYPERGLYCEMIA

WHAT IS HYPERGLYCEMIA?
Hyperglycemia is an above normal (or high) blood sugar
level.  High blood sugar levels are usually associated
with diabetes mellitus.  The build up of sugar causes a
release of fatty acids (ketones).  In diabetes, hyperglycemia
is caused by a lack of insulin, the hormone that helps to
break down sugar.  It can also be caused by stress or
infections.  Treatment is given to lower the blood sugar
level and correct the dehydration that occurs.

WHAT SHOULD I KNOW AND DO FOR HYPERGLYCEMIA?
- Keep yourself well hydrated during any illness, no
  matter how minor it is.
- If you are diabetic, seek medical assistance for any
  illness, infection, or fever.
- If you are diabetic, use your insulin correctly.
  Follow the doctor's orders for dose and time.
- Eat regular well balanced meals.  Follow the diabetic
  diet that you are given by your doctor.
- It is important to check your blood sugar level regularly.

WHEN SHOULD I FOLLOW UP WITH THE DOCTOR?
- If you develop nausea or vomiting.
- If you have a fever greater than 100 degrees.
- If you have diarrhea or abdominal pain.
- If you have any frequency of urination and you stay thirsty.
- If you have been feeling sick or weak for several days.

  Your condition may benefit from home health services.
  Please ask for home health assistance or information.       0103>

Helena Regional Medical Center
1801 Martin Luther King Dr, Helena, AR 72342
1-870-338-5800
**Patient: WILLIAMS, AL   DOB: 11/17/1969   Patient #: 898265   MRN: 000130631   Date In: 03/28/2011**
**Discharge Instructions**

## DIABETES

DIABETES

WHAT IS DIABETES?
Diabetes is a disease, which affects the body's ability to break
down sugar.  This happens because the body can not produce
enough insulin to break down the food you eat causing a buildup
of sugar in the blood.  There are two kinds of diabetes, Type I
and Type II.  Type I diabetes requires daily injections of insulin,
while Type II is often controlled by a special diet or oral medicines.

Diabetic individuals may experience conditions where the sugar
level drops very low (hypoglycemia) or becomes extremely high ketoacidosis).

WHAT SHOULD I KNOW AND DO FOR DIABETES?
- Take medications as prescribed.
- Check with the doctor before using other medicines with
  medications to control the blood sugar.
- Practice good personal hygiene with special care for skin, teeth, mouth
  and feet.
- Follow your prescribed diet and eat well balanced meals.
- Maintain a regular exercise program.
- Have regular checkups.
- Learn the warning signs and treatment recommendations for too high or too lov
  blood sugar.
Low Blood Sugar (Hypoglycemia): High Blood Sugar (Hyperglycemia):
- Feeling weak              - Increased thirst
- Feeling nervous           - Increased urinating
- Sweating                  - Feeling very tired
- Headache and/or confusion
- Monitor blood sugar regularly, either through urine testing or home blood
  monitoring.

WHEN AND WHY SHOULD I FOLLOW UP WITH THE DOCTOR?
- If you have:
  - prolonged fever, vomiting or diarrhea
  - increased levels of sugar in home urine or blood testing
  - frequent low blood sugar reactions
- If you develop any cracks, ulcers or discoloration of your skin, especially (
  the feet.
- For any problems with your eyesight.
- For any unexplained fatigue or weakness.
- Keep all regularly scheduled appointments with your doctor.

Your condition may benefit from home health services.
Please ask for home health assistance or information.                    0:

Helena Regional Medical Center
1801 Martin Luther King Dr, Helena, AR 72342
1-870-338-5800
**Patient: WILLIAMS, AL  DOB: 11/17/1969  Patient #: 898265  MRN: 000130631  Date In: 03/28/2011**
**Discharge Instructions**

## CONTUSIONS

CONTUSIONS

WHAT IS A CONTUSION?
A contusion (bruise)is a discoloration of the skin caused when
blood vessels are damaged and bleed into the tissues under the skin.
The skin is usually not broken.  Contusions are usually caused by blunt
trauma. Symptoms; A dark blue, purple or red discoloration of the
skin (turns green, yellow or brown as it heals), tenderness and
possible swelling over the area.

WHAT SHOULD I KNOW AND DO FOR CONTUSIONS?
- Apply ice or cold packs to the area for 10-15 minutes every hour for the
  first 24-48 hours after injury.
- Elevate the injured areas as much as possible to help reduce swelling.
- Large contusions should be watched closely for increased size or swelling.

WHEN AND WHY SHOULD I FOLLOW UP WITH THE DOCTOR?
- If the contusion is causing severe pain.
- If you develop numbness or tingling around or below the contusion.
- If you have many contusions or large contusions with little or no
  injury.

Your condition may benefit from outpatient rehab therapy services.
Please ask for this referral or more information.                    010:

Helena Regional Medical Center
1801 Martin Luther King Dr, Helena, AR 72342
1-870-338-5800
**Patient: WILLIAMS, AL   DOB: 11/17/1969   Patient #: 898265   MRN:  000130631   Date In: 03/28/2011**
**Discharge Instructions**

## Illness/Injury & Medicine Topics
DIABETES (English)
HYPERGLYCEMIA (English)
CONTUSIONS (English)

## Special Instructions

Return to jail, follow up with Dr. Webber in office in 1-2 days for prescripti
for all meedications. Return to ER for emergent needs. Follow up with optometr
for recheck of eyes in 2-3 days.

Referred to:

Webber, David, DO
Phone:(870)338-9244
504 Pecan Helena, AR 72342

Follow up in 1 days

Your emergency care provider today was: **LEVY, ARTHUR, MD**

## Acknowledgement

I have received and I understand the instructions as described above.

X‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾   ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
Patient or Guardian                          Staff

3/28/11 ‾‾‾‾‾‾‾‾‾‾‾‾   15:23 ‾‾‾‾‾‾‾‾‾‾‾‾
Date                                              Time

# HELENA REGIONAL MEDICAL CENTER

## GENERAL INFORMATION

```
PT NAME:   WILLIAMS AL                ACCT#:0898265    VIP: N              CONFIDENTIAL: Y
ADMIT DATE/TIME: 03/28/11 15:48                        REC TYPE:           MR#: 000130631
DISCHARGE DATE/TIME:  03/28/11  15:48                  LOCATION:           SERV: EOP
ADMIT MD:  WEBBER DAVID DO                             ROOM/BED:    /      CLERK:MNA
ER/ATTEND MD: LEVY ARTHUR                                                  PT TYPE/ACCOM: E
PCP MD: WEBBER DAVID DO                                ADM PRIORITY:       MRSA/ISOLATION:
REASON FOR VISIT:                                      ADM SOURCE: 8
PAIN MUTIPLE SITES NO KNOWN INJURY
COMMENTS:
```

## PATIENT DEMOGRAPHICS

```
STREET: 1003 PC 300 RD                 DOB/AGE:11/17/1969   41        SS#: 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
CITY:    WEST HELENA        AR          SEX: M                         RELIG: U
ZIP:     72390                          MAR STATUS: S                  BIRTH PLACE:
HOME PHONE: (870)995-7764
```

| NEXT OF KIN | PERSON TO NOTIFY | VISIT HISTORY |
|---|---|---|
| RELAT TO PT: 01 SPOUSE<br>NAME:    WILLIAMS CAROLYN<br>STREET:  UNKNOWN<br>CITY/ST: MARVELL          AR<br>ZIP:     72366<br>H- (870)995-7764 W- (000)    - | RELAT TO PT: 32 MOTHER<br>NAME:    CHESTNUT DOROTHY<br>STREET:<br>CITY/ST:<br>ZIP:<br>H-(870)829-1141  W-(000)    - | LST DATE: 03/21/11<br>LST SRVCD: EOP<br><br>OCCUR CD:  11<br>DT OF INJ: 03/28/11 |

## EMPLOYER & GUARANTOR INFORMATION

```
PT EMPLOYER:                  GUARANTOR:WILLIAMS AL              SS#: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
ADDRESS:                      GRNTOR EMP:
CITY/STATE:                   ADDRESS:   1003 PC 300 RD
ZIP CODE:                     CITY/STATE: WEST HELENA          AR
PHONE:                        ZIP CODE:    72390
                              PHONE:   (870)995-7764
                              REL TO PAT: 18  SELF
```

## INSURANCE COVERAGE INFORMATION

```
PRIM INS:  SELF PAY O P        F/C: S        SECD INS:
ADDRESS:   1003 PC 300                        ADDRESS:

CITY/STATE:WEST HELENA         AR             CITY/STATE:
ZIP CODE: 72390                               ZIP CODE:
PHONE:    (870)995-7764                       PHONE:

POLICY#:   430395344                          POLICY#:
GROUP#:                                       GROUP#:
AUTH#:                                        AUTH#:
EMPLOYER:                                     EMPLOYER:
INSUREDS NAME: WILLIAMS AL                    INSUREDS NAME:
REL TO PAT:   18 SELF                         REL TO PAT:
DOB: 11/17/1969                               DOB:
```

ER HMO AUTHORIZATION          YES _____    NO _____      ER HMO AUTHORIZATION          YES _____    NO _____

BY _____    TIME _____      BY _____    TIME _____

O.O.T _____   PGR PROTOCAL _____      O.O.T _____   PGR PROTOCAL _____

ASSEMBLED _____          DIAGNOSIS CODES                    PROCEDURE CODES

CODED/ABSTRACTED _____    _____  _____  _____          _____  _____  _____

ANALYZED _____            _____  _____  _____          _____  _____  _____

```
>>>>   0898265  000130631    EOP    03/28/11   15:48      DATE PRINTED: 03/28/11
```

8. **GENERAL CONSENT FOR TESTS, TREATMENT, PHOTO, VIDEO, AND SERVICES *(continued from front):***
I consent to examinations, blood tests (including blood tests for communicable diseases such as hepatitis and HIV/AIDS when healthcare personnel have been exposed to my blood and/or body fluids), laboratory and imaging procedures, medications, infusions, nursing care and other services or treatments rendered by my physician, consulting physicians, fellows, residents, interns, and their associates and assistants, or rendered by Facility personnel under the instructions, orders or direction of such physician(s), fellow(s), resident(s), or intern(s).

I agree and understand that all physicians (including fellows, residents, and interns), dentists, oral surgeons, and podiatrists involved in my care in any way are responsible and liable for their own acts and omissions, and the Facility is not responsible or liable for the acts or omissions of the aforementioned. Services may be performed by independent contractors who are not employed by the Facility. I am aware that the practice of medicine is not an exact science and further understand that no guarantee has been or can be made as to the results of the treatments, care or examinations in the Facility.

I have been informed of the treatment procedures considered necessary for me and that the treatments/procedures will be directed by a physician and may be performed by such physician and/or one or more additional physicians, fellows, residents, interns, and employees of the Facility.  I understand that one or more physicians, fellows, residents, and/or interns at the Facility may treat me or participate in my treatment.  I understand that no guarantee or assurance has been made regarding (1) which physicians and/or fellows, residents, or interns will treat me or participate in my treatment and/or (2) the results that may be obtained from treatment.

*patient Initials* — I consent to the photographing or videotaping, including appropriate portions of my body, for medical and medical record documentation purposes, provided said photographs or videotapes are maintained and released in accordance with protected health information regulations.

9. **ADVANCE DIRECTIVE ACKNOWLEDGEMENT:**
Federal law requires that patients be provided information about their rights to make advance health care decisions, including a Living Will, Durable Medical Power of Attorney or designation of a surrogate decision maker for healthcare decisions. If you have already completed any of these documents, please inform your physician and the Facility.     ***Please check one:***

❏ I have executed an advance directive and have supplied a copy to the Facility.
❏ I have executed an advance directive and have been requested to supply a copy to the Facility.
❏ I have reviewed the directive(s) on file with this Facility and it is / they are my current directive(s).
❏ I have not executed an advance directive. I have received information about advance directives from this Facility.
❏ I have not executed an advance directive. I have requested advance directive information from this Facility.
☑ I have not executed any advance directives, and I do not wish to receive information about advance directives from this Facility.

10. **RESEARCH STUDIES:**     ***Please check one:***
❏ No   ☑ Yes   Are you currently a participant in any research study or project:  *If yes, please briefly describe what is being studied (drug, medical device or other)*  DIABETES @ UAMS
Who can the Facility contact with questions about the study? _____

11. **SMOKING CESSATION INFORMATION:**
❏ Upon admission, I received the Smoking Cessation Information Packet, which includes information on: health risks associated with smoking, community resources for smoking cessation programs and health risks associated with second hand smoke.  If I have further interest in smoking cessation programs and education, I will request additional information from the facility staff or my physician.

The undersigned certifies that s/he has read the foregoing, understands it, accepts its terms, has received a copy of it and is the patient or is duly authorized by the patient as their agent to execute the above.

| Patient's Signature or Legal Representative | Date 3/28/11 | Time 530 |
|---|---|---|
| Relationship to Patient | Interpreter, if utilized | |
| Witness Signature | If Telephone Consent, Second Witness' Signature | |

Inpatient / Outpatient Conditions of Admission
and Consent to Medical Treatment
ADM-1701G - Back    (Rev. 01/10)

HELENA REGIONAL MEDICAL CENTER
WILLIAMS AL            HSV:EOP
Admit: 03/28/11 Med Rec #: 000130631
Adm Dr.: WEBBER DAVID DO
DOB:11/17/1969  41  Sex: M RM#:   /
                    Pat #:0898265



# INITIAL ASSESSMENT FORM

*Helena Regional Medical Center*

| | | |
|---|---|---|
| PRIORITY: **3** | Patient: **WILLIAMS, AL** | Pt#: 898265 |
| **Urgent** | DOB: 11/17/1969  AGE: **41YRS**  Sex: M | MR#: 000130631 |
| | EDP: LEVY, ARTHUR, MD | Worker's Comp: |
| DATE: 03/28/2011 | PCP: Webber, David, DO | Emp. Referred: |

| Presentation Time: 15:44 | Triage Time: 15:48 | Arrival Mode: AMB - PD |
|---|---|---|

| Height: 6 ' 0 "  Weight: 200 lbs. 0 oz. 90.91 kgs. LMP:n/a | Last Tetanus: n/a | Acc By: Prison Officer |
|---|---|---|

| | | |
|---|---|---|
| Chief Complaint: | PAIN--MULTIPLE SITES (NO KNOWN INJURY) HYPERGLYCEMIA--DIABETES | **Vital Signs** |
| | | T: 98.2 PO |
| Brief Assessment: | pt sent from Dr. Webbers office for elevated blood sugar, pt c/o hurting all over. Is inmate in county jail. Pt reports that he goes to several different doctors in Memphis and Little Rock, and that Dr Webber is doctor for prison, he does not see him. | P: 97 regular |
| | | R: 20 unlabored |
| | | BP: 176/109 |
| | | O2: 100 % RA N.C. |

| | | | |
|---|---|---|---|
| NIGHT SWEATS | NO | HEMOPTYSIS | NO |
| WEIGHT LOSS | NO | FEVER | NO |
| ANOREXIA | NO | | |

Pain Intensity Scale: 10 / 10
Pain Location: multiple areas

| | |
|---|---|
| NAUSEA | NO |
| ABUSE SUSPECTED | NO |
| PNEUMONIA VACCINE W/I 5 YRS | UNK |
| FLU VACCINE THIS SEASON | UNK |
| BEST NUMBER TO CALL | NO |
| RECENT WEIGHT LOSS | NO |
| INCREASE IN THIRST | NO |
| VOIDING FREQUENTLY | NO |
| INCREASE IN APPETITE | NO |
| RECENT ILLNESS/INFECTIONS | NO |

| | |
|---|---|
| Sudden Onset: | |
| Pre-Hospital Treatment: | none |
| Pediatric Assessment: | N/A |
| Past Medical History: | DDRob COPD, htn, IDDM |

**Allergies:** codiene

Medicines:  SEE MED SHEET,

Nurse Signature: _____  RMR

Additional Notes:

Rev 07/30/09

# General Medical – Adult

**Helena Regional Medical Center**

1 of 2

## Demographics and Triage:

Date In: 03/28/2011  Pres Time: 15:44   Pt#: 898265   MR#: 000130631   Triage Time: 15:48

Name: WILLIAMS, AL   Arrival Mode: AMB - PD

Age: 41YRS  DOB: 11/17/1969  Sex: M  Wt: lbs: 200  kgs: 90.9

PCP: Webber, David, DO

EDP: LEVY, ARTHUR, MD

Chief Complaint: PAIN—MULTIPLE SITES (NO KNOWN INJURY)   Pain / Location: 10/multiple areas

T: 98.2  PO
P: 97  regular
R: 20  unlabored
BP: 176/109
O2 Sat: 100  % NL / hypo

**Triage Note:** pt sent from Dr. Webbers office for elevated blood sugar, pt c/o hurting all over. Is inmate in county jail. Pt reports that he goes to several different doctors in Memphis and Little Rock, and that Dr Webber is doctor for prison, he does not see him.

## CC / HPI:
Level 1-3 = 1-3 elements    Level 4 = 4 elements    Level 5 = 5 elements

Time Seen: 15:48   ☐ Translator   ☒ Nursing Notes Reviewed

Hx Source: patient  family  spouse  EMS  nsg. home  other:

Hx Ltd By: ALOC  poor historian  dementia  severity  hearing  intoxicated

Onset: indeterminate___min___hrs___days___wks___mths ago  sudden / gradual

Duration: constant / intermittent  lasted: ___secs___mins___hrs___days

Timing (currently): present / absent  decreased / increased  wax-wane

Severity: mild  mod  sev  ___/10 current  ___/10max  denies pain

Location pain/sxs:

Radiation:

Quality: cannot describe

Exacerbated By: nothing

Relieved By: nothing

Associated S&S: none

Context:

Additional History: *(handwritten, illegible)*

## ROS:
Level 1-3 = 1 system    Level 4 = 2-9 systems    Level 5 = 10+ systems

| General | Eyes | ENT | Respiratory | Cardiovascular | Gastrointestinal | Genitourinary |
|---|---|---|---|---|---|---|
| Fever / chills | Visual Changes | Sore Throat | Shortness of Breath | Chest Pain | Dysphagia | Dysuria |
| Weight loss | Redness | Hoarse Voice | Cough | Palpitations | N / V / D | Frequency |
| General Weakness | Dryness | Epistaxis | Congestion | PND | Constipation | Vaginal Bleeding |
| Polyurea | Diplopia | ↓ Auditory Acuity | Hemoptysis | Orthopnea | Rectal Bleeding | Vaginal Discharge |
| Polydipsia | Itching | Nasal Drain/Cong. | | DOE | Black Stool | Penile Discharge |

| Musculoskeletal | Neurological | Psychological | Skin | Immunological | All Systems Reviewed |
|---|---|---|---|---|---|
| Joint Pain | Syncope | Anxiety | Rash | Recurrent Hives | All other systems negative |
| Joint Swelling | Headache | Depression | Pruritis | HIV / AIDS | Unable to obtain due to: acuity  ALOC |
| Neck Pain | Focal Weakness | Hallucination | Lesions | Anaphylactic Rxn | chronic dementia  poor historian |
| Back Pain | Paresthesia | Insomnia | Bruising | | intoxicated |
| Myalgias | Confusion | Stress | Bleeding | | |

## Past Family Social Hx:
Level 1-3 = none    Level 4 = 1 section    Level 5 = 2-3 sections

Past Medical History:
ESRD, htn, IDDM

Current Medications:
SEE MED SHEET

Allergies:
codiene

Reproductive History: G___ P___ A___  Last Menstrual Period: n/a

Menses History: Regular  Irregular  Post-partum  Pre-menarch  ammenorrhea

Last Tetanus: n/a

Additional Past Medical History: CAD  MI  CHF  DM  CA  CVA  trauma  recent surgery  COPD  HTN  TIA  hyperlipidemia

Past Surgical History: CABG  APPY  Chole  TAH / BSO  TURP

Family History: Negative  CAD / MI  DM  CA  CVA

Social History: Tobacco: N  ___PPD x ___yrs  Quit

Alcohol: Denies / Social / Heavy / Alcoholic

Substance Abuse: N / Y : _____

Occupation:  Living: M / S / D / Alone

## Physical Exam:
Level 2-3: 2-4 systems  Level 4: 5-7 systems  Level 5: 8+ systems  NL* indicates system examined and negative

General: NL* NAD  mild  moderate  severe  well nourished  no evidence of trauma
anxious  cachetic  obese  disheveled  dehydrated  chronic illness  nsg. home pt.  other:_____

HENT: NL  NC / AT  pharynx NL  ears NL  nose NL
sinus tenderness: maxillary R / L  frontal: R / L  rhinnorhea: clear / purulent  ear canal: R / L erythema / obscured
TM: R / L erythema / bulging / perf.  pharynx: exudate  erythema  absces  other:_____

Eyes: NL  PERRL  EOMI  conjunctiva NL  fundus NL
R pupil___mm  L pupil___mm  conjunctiva: R / L injected / exudate  visual changes  other:_____

Pro-MED Complement   (circle positives, \ backslash pertinent negs, provide additional information)   Rev. 06/26/07

**General Medical - Adult** 1 of 2                    **Helena Regional Medical Center**

Name: **WILLIAMS, AL**          Date in:03/28/2011     MR#:000130631          Pt#:**898265**

| Physical Exam: cont. | Level 2-3: 2-4 systems | Level 4: 5-7 systems | Level 5: 8+ systems | NL* indicates system examined and negative |

**Neck:** NL* JVD negative  no adenopathy  supple  thyroid NL  non-tender  ROM NL  trachea midline  carotids NL
JVD  R / L adenopathy  meningismus  thyromegaly  tender: R / L  ROM: limited / painful  carotid bruit: R / L  other:_____

**Chest:** NL* chest wall non-tender  NL excersion / expansion  breasts NL
tender to palpation: R / L chest wall / sternum  retractions  breast R / L mass / tenderness  other:_____

**CV:** NL* RRR  no murmur  no gallup  PMI NL  pulses NL
tachycardic  bradycardic  irregular/irregular rhythm  extrasystoles  murmur __/6 systolic/diastolic  other:_____
carotid pulses: decreased / absent /bruit  R / L  pulses: decreased/ absent  R / L radial  ulnar  pedal  tibial

**Respiratory:** NL* no respiratory distress  breath sounds NL  effortless
unequal / decreased sounds  crackles  wheezes  rales  rhonchi  labored  stridor  retractions  other:_____

**Abdomen:** NL* appearance NL  BS NL  soft  non-tender  rectal NL  guiac negative  no organomegaly
obese  rigid  tender  BS: hyper / hypo / absent  mass / pulsatile  heme + stool / gross blood per rectum  other:_____

**Back:** NL* ROM NL  no CVAT tenderness
R / L CVAT  + R / L straight leg lift  dec. ROM  tender bony / musc: dorsal  lumbar  sacral  coccyx

**Extremities:** NL* non-tender  full ROM  no edema
pedal edema R / L  homans R / L  erythema / edema  dec ROM  RUE  RLE  LUE  LLE

**Skin:** NL* warm - dry  color NL  no rash  no erythema  no edema
hot  cold  diaphoretic  cyanotic  rash  edema  ecchymosis  urticaria  other: _____

**Neuro:** NL* A&Ox3  CN's NL (2-12)  motor / sensory NL  cerebellar NL  DTRs NL
altered LOC  disoriented to:  time / place / person  CN deficit #:____ weakness  parathesia
cerebellar dysfunction  DTR: diminished / absent  other:_____

**Psych:** NL* affect NL  behavior NL  mood NL
anxious  tearful  hostile  avoids eye contact  flat affect  depressed  hostile  other_____

**GU:** NL* ext genitalia NL  no lesion  no edema  circ. / uncirc.  inguinal canals NL  deferred
external ser: sores / ulcerations / herpes like  bleeding  erythema  edema  indwelling foley  hernia

P=Pain, T=Tender, M=Mass

## Medical Decision Making:

NL / except   2.6  14.8  329   UA: NL / except       EKG:__ Interpreted by EDP __ NSR
                   40.2                WBC _____ LE _____      __ other: _____
NL / except   139  41  57           RBC _____ Blood _____    CXR:__ Interpreted by EDP __ NAD
              4.7                    Nitrites _____ Bacteria _____  __ NAI __Infiltrate
ALT___ Amy___ Trop___ PT 1.3       Preg Screen: urine/serum: neg / pos   Abd:__ NSBGP __ obstruction _____
AST___ Lipase___ CKMB___ INR___    Tox Screen: neg / pos      Other / US / CT: _____
Other / Procedures:

## Consultation:

Time:_____. Disc with Dr._____
will ___see patient in office ___ admit ___ see in consult
Time:_____. Disc with Dr._____
will ___see patient in office ___ admit ___ see in consult

## Clinical Impression:

1. _____
2. _____
3. _____
4. _____
5. _____

## Clinical Course & Re-evaluation:

Meds:_____ Time:_____ Improved / Worse / Unchanged
_____ Time:_____ Improved / Worse / Unchanged
IVF:_____ ☐ Patient re-examined
☐ Critical care: 30-74 minutes / 75-104 minutes  ☐See procedure note  ☐See addendum

## Disposition:

Time:_____
Discharge: Home  NH  Psych Fac  Jail
Admit: Floor  ICU  PCU  Obs  OR  Tele  Psych  Peds   ☐Orders written
Transfer: Facility:_____  Rcv Physician:_____
AMA  LWOT  DOA  Expired          ☐Transfer forms competed
Condition: Stable  Satisfactory  Improved  Critical  Guarded  Emergent  Non-emergent

## Instructions:

Follow up with:   ☐ Prescription(s) given:   ☐ Follow up care discussed with:  patient  family  spouse  other:_____
☐ PMD                                    Additional Instructions:_____
☐ Doctor _____
☐ ED
☐ Other _____
In ___ day(s) ☐ AM

Signatures: _____ PA/ARNP _____ MD/DO

**Pro-MED Complement**          (circle positives, \ backslash pertinent negs, provide additional information)          Rev. 06/26/07

# ORDER PROCEDURE FORM
## MEDICAL EMERGENCIES

**Helena Regional Medical Center**

Name: **WILLIAMS, AL**                                    Pt#: **898265**

Date In: 3/28/2011          Time:_____

Age: 41YRS    DOB: 11/17/1969    Sex: M    MR#: 000130631
EDP: LEVY, ARTHUR, MD        PCP: Webber, David, DO

| Laboratory Tests | | Order Sent | By | Other Diagnostic Tests | | | |
|---|---|---|---|---|---|---|---|
| | | | | Order Time | Radiology | Order Sent | By |
| 1603 | CBC  auto | 1603 PR | | | CXR (PA/LAT - Portable) | | |
| | BMP  CMP | | | | | | |
| | Amylase | | | | Abd. (flat & upright) | | |
| | Drug screen (serum), (urine) | | | | | | |
| | ETOH | | | | | | |
| | Liver profile | | | | | | |
| | Magnesium | | | | | | |
| | Glucose (bedside), (serum) | | | | Cardiopulmonary | | |
| | UA | | | | EKG | | |
| | | | | | ABG | | |
| | | | | | O2          LPM | | |
| | Misc.  Orders | | | | Medical Necessity Information: | | |
| | Previous Medical  Records | | | 1722 Accu V 388 | | | |
| | Physical Therapy - Eval & Tx | | | | | | |

Weight:
lbs: 200
kgs: 90.9

Allergies: codiene

| Order Time | Medication / Dosage / Route | VO | Read Back | Adm time | Adm by | Site | Time | Reassessment | | | Pain | Initials |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16:20 | Hunal R 20 units | ☐ | | 1800 | RL | Rt arm | | ☐ Improved ☐ Worse ☐ Unchanged | | | | |
| 1696 | NS 1000 mL bolus | ☐ | | 1800 | RL | | | ☐ Improved ☐ Worse ☐ Unchanged | | | | |
| | Hunal R 10 units | ☐ | | 1800 | RL | Rt arm | | ☐ Improved ☐ Worse ☐ Unchanged | | | | |
| | | ☐ | | | | | | ☐ Improved ☐ Worse ☐ Unchanged | | | | |
| | | ☐ | | | | | | ☐ Improved ☐ Worse ☐ Unchanged | | | | |
| | | ☐ | | | | | | ☐ Improved ☐ Worse ☐ Unchanged | | | | |
| | | ☐ | | | | | | ☐ Improved ☐ Worse ☐ Unchanged | | | | |

| Order Time | IV / Solution / Added Medication | StartTime | Device/Size | Location | Attempts | Amount | Start by | D/C Time | Amt Infused | D/C by |
|---|---|---|---|---|---|---|---|---|---|---|
| 1650 | ☐ KVO Device: | | 20g | Rt hand | | | RL | | | |
| 1650 | ☐ IV Fluid: | | NS 1000 mL | | | | RL | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

## Procedures / Nursing Assistance

| | | |
|---|---|---|
| ☐ Cardiac Monitor: Rate____ Rhythm:_____ | ☐ NGT Insertion #_____ Fr. | ☐ Endotracheal Intubation |
| ☐ NIBP Monitor | ☐ Gastric Lavage | ☐ Cardioversion |
| ☐ Pulse Oximetry | ☐ Central Line Placement | ☐ Oral Airway Insertion |
| ☐ Urinary Catheter Insertion: #_____ Fr. | ☐ CVP Monitoring | ☐ Oropharyngeal Suctioning |
| ☐ CPR | | |

## Discharge Instructions

| Initials/Signature: | Initials/Signature: | Initials/Signature: | Initials/Signature: |
|---|---|---|---|
| PA/ARNP: | | Physician's Signature: | |

Rev. 09/14/04

```
Print date:  3/28/11 16:25        P A T I E N T   R E P O R T              Page    1
Printed by: SMINOR                       **** FINAL ****
HELENA REGIONAL MEDICAL CENTER                           LABORATORY DEPARTMENT
1801 MLK DRIVE
HELENA        AR  72342
```

```
PAT NAME: WILLIAMS AL              STATUS: O/P / EOP       ADM DATE:  3/28/11
PATIENT#: 0898265  XREF#:  690594     DOB: 11/17/69        ADM PHYS: LEVY ARTHUR
START DT:  3/28/11 16:02           AGE/SEX: 41 / M         ORD PHYS: LEVY ARTHUR
ORDER#  :      100                    MR#: 000130631        FAM PHYS: WEBBER DAVID DO
SP. INSTR CMNT:
COLLECT  DT/TM:  3/28/11 16:12     BY: AB
RECEIVED DT/TM:  3/28/11 16:12     BY: SM
VERIFIED DT/TM:  3/28/11 16:25     BY: SM
```

*****HEMATOLOGY*****

| Test Name | Result | Flags | Reference Range | Units |
|-----------|--------|-------|-----------------|-------|
| CBC W PLT & DIFF | | | | |
| WBC | 7.6 | | 4.8 - 10.8 | x10^3/uL |
| RBC | 4.66 | L | 4.70 - 6.10 | 10^6/uL |
| HGB | 14.0 | | 14.0 - 18.0 | G/DL |
| HCT | 40.2 | L | 42.0 - 52.0 | % |
| MCV | 86.3 | | 80.0 - 94.0 | UM^3 |
| MCH | 30.1 | | 27.0 - 31.0 | PG |
| MCHC | 34.8 | | 33.0 - 39.0 | % |
| RDW | 12.8 | | 12.0 - 15.0 | % |
| PLT | 329 | | 130 - 400 | x10^3/uL |
| MPV | 7.2 | L | 7.4 - 10.4 | um |
| NEU% | 75.3 | H | 36 - 66 | % |
| LYMPH% | 14.2 | L | 24 - 44 | % |
| MONO% | 5.5 | L | 6 - 12 | % |
| EOS% | 0.8 | L | 1 - 3 | % |
| BASO% | 4.2 | H | 0 - 1 | % |
| NEU# | 5.7 | | 2 - 6.9 | |
| LYM# | 1.1 | | 0.6 - 3.4 | |
| MONO# | 0.4 | | 0 - 9 | |
| EOS# | 0.1 | | 0 - 0.7 | |
| BASO# | 0.3 | H | 0 - 0.2 | |

```
 Print date:  3/28/11 16:46        P A T I E N T    R E P O R T                    Page    1
 Printed by: SMINOR                      **** FINAL ****
 HELENA REGIONAL MEDICAL CENTER                             LABORATORY DEPARTMENT
 1801 MLK DRIVE
 HELENA        AR  72342


 PAT NAME: WILLIAMS AL             STATUS: O/P / EOP       ADM DATE:  3/28/11
 PATIENT#: 0898265  XREF#:  690595       DOB: 11/17/69     ADM PHYS: WEBBER DAVID DO
 START DT:  3/28/11 16:02          AGE/SEX:  41 / M        ORD PHYS: LEVY ARTHUR
 ORDER# :      200    300             MR#: 000130631       FAM PHYS: WEBBER DAVID DO
 SP. INSTR CMNT:
 COLLECT  DT/TM:  3/28/11 16:12    BY: AB
 RECEIVED DT/TM:  3/28/11 16:12    BY: SM
 VERIFIED DT/TM:  3/28/11 16:46    BY: SM
```

******CHEMISTRY******

| Test Name | Result | Flags | Reference Range | Units |
|---|---|---|---|---|
| ACETONE | NEGATIVE | | | NEGATIVE |
| COMPREHENSIVE METABO | | | | |
| SODIUM | 130 | L | 136 - 146 | MEQ/L |
| K | 4.4 | | 3.50 - 5.10 | MEQ/L |
| CHLORIDE | 94 | L | 98 - 108 | MEQ/L |
| CO2 | 25 | | 22 - 35 | MEQ/L |
| ANIONGAP | 15 | | 0 - 20 | |
| GLUCOSE | 557 | CH | 70 - 110 | MG/DL |
| BUN | 13 | | 7 - 22 | MG/DL |
| CREA | 1.3 | | 0.8 - 1.3 | MG/DL |
| GFR | >60 | | | mL/min/1.73m^2 |
| BUN/CREA | 10.0 | | | |
| ALBUMIN SERUM | 3.5 | | 3.4 - 5.0 | G/DL |
| CALCIUM | 9.4 | | 8.5 - 10.1 | MG/DL |
| T BILI | 0.5 | | 0.0 - 1.5 | MG/DL |
| ALKALINE PHOSPHATASE | 125 | | 50 - 136 | U/L |
| PROTEIN | 8.1 | | 6.4 - 8.2 | G/DL |
| GLOBULIN | 4.6 | H | 2.5 - 3 | |
| AGRATIO | 0.8 | L | 1.1 - 2.2 | |
| SGOT/AST | 13 | L | 27 - 47 | U/L |
| SGPT/ALT | 23 | L | 30 - 65 | IU/L |

```
REFERENCES RANGES:
Average EGFR for Healthy Adults:  >60 mL/min/1.73 m^2
Chronic Kidney Disease:           15 - 60 mL/min/1.73 m^2
Kidney Failure:                   <15 mL/min/1.73 m^2
REFERENCE RANGES ARE NOT AVAILABLE FOR PATIENTS <18 OR >70 YEARS OF AGE
AND WILL BE RESULTED WITH TNP (TEST NOT PERFORMED).
SOURCE:  NATIONAL KIDNEY DISEASE PROGRAM, "RATIONALE FOR USE AND REPORTING
OF ESTIMATED GFR", MARCH 2006
```

```
CRITICAL VALUE RESPONSE:
  3/28/11 16:46 CMP      CALLED TO SHERRY @1643 READBACK
                         GLUC 557
```

```
Print date:  3/28/11 18:11        P A T I E N T   R E P O R T                    Page     1
Printed by: GMAXIE                      **** FINAL ****
HELENA REGIONAL MEDICAL CENTER                              LABORATORY DEPARTMENT
1801 MLK DRIVE
HELENA        AR  72342


PAT NAME: WILLIAMS AL              STATUS: O/P / EOP      ADM DATE:  3/21/11
PATIENT#: 0897704  XREF#:  689167       DOB: 11/17/69     ADM PHYS: LEVY ARTHUR
START DT:  3/21/11  2:19         AGE/SEX:  41 / M         ORD PHYS: LEVY ARTHUR
ORDER#  : R    100                      MR#: 000130631    FAM PHYS: WEBBER DAVID DO
SP. INSTR CMNT:
COLLECT  DT/TM:  3/21/11  2:30      BY: AB
RECEIVED DT/TM:  3/21/11  2:34      BY: AMB
VERIFIED DT/TM:  3/21/11  2:55      BY: GXM


                       ******CHEMISTRY******
---------------------------------------------------------------------------
  Test Name                      Result  Flags    Reference Range    Units
---------------------------------------------------------------------------
ALCOHOL SERUM                      3    H                 0          MG/DL
10-50 mg/dl= little or no influence
50-100 mg/dl= some influence on stereo vision
100-150 mg/dl= euphoria, prolonged reaction time
150-200 mg/dl= moderate to severe poisoning
200-250 mg/dl = severe poisoning
over 250 mg/dl = possible fatal coma


---------------------------------------------------------------------------
```

# Helena Regional
### MEDICAL ✚ CENTER
**Medication Reconciliation Admission/Discharge List**
**(Include Herbals, OTC Medications and Vitamins)**

Admission Ht. 6'0   Admission Wt. 200   ☐actual ☑stated

Allergies: Codiene

Medicine list obtained from: ☐Prescription Bottle ☑Patient ☐Family ☐Other _____

☐Medication or list not brought in with patient.

Pharmacy Freds / UAMS / Church Heath Center / & several others

| Home Medication | Dose | Route | Frequency | Date of Last Dose | Time of Last Dose | Nurse's Initial | Continue at discharge YES | NO |
|---|---|---|---|---|---|---|---|---|
| Humulin R | sliding scale | ing | as needed | Unknown | | RL | ✓ | |
| Humulin 70/30 | 36 units | inj | am | Unknown | | RL | ✓ | |
| Lantus | 42 units | inj | pm | Unknown | | RL | ✓ | |
| Mevacor | | oral | 1 x day | Unknown | | RL | ✓ | |
| Nexium | 40 mg | oral | 1 x day | Unknown | | RL | ✓ | |
| Percocet | ? | oral | as needed | unknown | | RL | ✓ | |
| Captopril | ? | oral | 2 x day | unknown | | RL | ✓ | |
| Amlodipine | ? | oral | 1 x day | unknown | | RL | ✓ | |
| Vitamin D | I | oral | 1 x day | unknown | | RL | ✓ | |
| Furosemide | ? | oral | 1 x day | unknown | | RL | ✓ | |
| Fish oil cap | I | oral | 1 x day | unknown | | RL | ✓ | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Nurse's Signature: _____ Date: 3/28/11 Time: 1548
_____ Date: _____ Time: _____
_____ Date: _____ Time: _____
_____ Date: _____ Time: _____

**Prescriptions for New Medications Given at Discharge**

| Medication | Dosage | Route | Frequency |
|---|---|---|---|
| Ø | | | |
| | | | |
| | | | |

☐Personal Meds Stored in Pharmacy. Medicine sent home with ☐Patient ☐other _____ (name)

Discharging Nurse's Signature: _____ Date 3/28/11 Time 1823

**\*\*FAX MEDICATION LIST TO PHARMACY\*\***

Patient Label

Original - Place in Chart    Copy- To patient at discharge

176-1410667    9/08

HELENA REGIONAL MEDICAL CENTER
WILLIAMS AL                    HSV:EOP
Admit: 03/28/11 Med Rec #: 000130631
Adm Dr.: WEBBER DAVID DO
DOB:11/17/1969  41  Sex: M  RM#:   /
Pat #:0898265

| | *Current Data -- Today's Visit:*   3/28/2011 | | |
|---|---|---|---|
| Name | **WILLIAMS, AL** | Pt#: 898265 | MRN: 000130631 |
| Chief Complaint: | **PAIN--MULTIPLE SITES (NO KNOWN INJURY)** | | |
| PMD: | **Webber, David, DO** | | |

Complaint Test Mapping indicates the following tests are required:

Complaint Test Mapping indicates the following tests are recommended:

*Note: To review tests ordered, click on the ED tab, select this patient and click the Orders button.*

***Patient has presented to ED 4 times since 4/9/2002. Maximum 6 visits displayed.***

| *Date In:*  3/21/2011 | *Disposition: D/C - HOME* | *EDP: LEVY, ARTHUR, MD* | *Pat #: 897704* |
|---|---|---|---|
| Chief Complaint: | **ALTERCATION--ALLEGED ASSAULT** | | |
| Final Diagnosis: | **Fracture--nose & facial contusion** | | |
| Phys Consulted: | **LEVY, ARTHUR, MD** | Admitting/Follow Up MD:  **PRIMARY, CARE** | |
| Services Rendered: | **EXAM Labs** | | |
| Meds Prescribed: | **ATIVAN (lorazepam), LORCET (hydrocodone/acetaminophen), TORADOL (ketorolac)** | | |
| Teaching Topics: | **CONTUSIONS, FRACTURE - NASAL** | | |

| *Date In:*  1/11/2011 | *Disposition: D/C - HOME* | *EDP: LEVY, ARTHUR, MD* | *Pat #: 892788* |
|---|---|---|---|
| Chief Complaint: | **HIP INJURY/PAIN--FX NOT SUSPECTED** | | |
| Final Diagnosis: | **strain left groin** | | |
| Phys Consulted: | | Admitting/Follow Up MD:  **PRIMARY, CARE** | |
| Services Rendered: | **EXAM X-Ray, Meds, DC Instr** | | |
| Meds Prescribed: | **LORTAB (hydrocodone/acetaminophen), TORADOL (ketorolac)** | | |
| Teaching Topics: | **STRAIN - MUSCLE** | | |

| *Date In:*  12/26/2010 | *Disposition: TRANS - EP TRAUMA* | *EDP: GUILLERMO, ENRIQUE, MD* | *Pat #: 891751* |
|---|---|---|---|
| Chief Complaint: | **GUNSHOT WOUND--EXTREMITY** | | |
| Final Diagnosis: | **gsw** | | |
| Phys Consulted: | | Admitting/Follow Up MD:  **reynolds** | |
| Services Rendered: | **EXAM Labs X-Ray, Meds, IVP, IV Fluids, All Monitors, Transfe** | | |
| Meds Prescribed: | | | |
| Teaching Topics: | | | |

| *Date In:*  5/31/2009 | *Disposition: D/C- POLICE* | *EDP: GUILLERMO, ENRIQUE, MD* | *Pat #: 849050* |
|---|---|---|---|
| Chief Complaint: | **HYPERGLYCEMIA--DIABETES** | | |
| Final Diagnosis: | **Diabetes -out of control, ETOH intoxication** | | |
| Phys Consulted: | **GUILLERMO, ENRIQUE, MD** | Admitting/Follow Up MD:  **PRIMARY, CARE** | |
| Services Rendered: | **EXAM Labs, Meds, IV Fluids, IVP, DC Instr** | | |
| Meds Prescribed: | | | |
| Teaching Topics: | **ALCOHOL INTOXICATION, DIABETES** | | |

**Patient: WILLIAMS, AL  DOB: 11/17/1969  Patient #: 898265  MRN: 000130631  Date In: 3/28/2011**

**Adult Assessment** 03/28/2011 16:04 RMR

**Room Assignment**: Patient assigned to room 4. Patient arrived in room ambulatory. Patient moved to room at 15:48. Time of primary assessment: 15:48.

**Psychosocial**: Patient's behavior is appropriate to the current situation. Patient currently is incarcerated. Support systems include family. Patient ambulates independently. Performs ADL's independently. Nutritional status is normal by appearance. States there are no religious or cultural beliefs that may impact the care delivered. Appears to be normally interacting with care giver(s) or others that are present.

**Safety**: Bedrails are in the upright position to protect patient from fall. Call light is within reach and patient or family was instructed on use. Bed height is at the lowest position. Patient is not at risk for fall as evidenced by: being alert and oriented at presentation, no known physical impairments, normal gait observed, < 60 years of age, no predisposing medical history.

**Pain**: Patient rates pain as 10 on a one-to-ten scale with ten as the worst pain ever. Pain is located in the hurts all over. Onset of pain was within the past 24 hours. Patient describes the pain as constant, aching. Pain is exacerbated by movement. Pain is improved or comfort is provided by prescription meds.

**Brief Assessment**: Patient is alert and oriented x 3. Respirations are unlabored. Skin is warm and dry, vascular status intact.

**Neurological**: Alert, oriented to person, place and time. Glascow Coma Score 15. Moves all four extremities equally with equal strength. Patient denies numbness or tingling. Pupils are brisk, equal, and reactive to light bilaterally. Patient is able to speak clearly. pt states he was assaulted at the jail and has a broken nose,old bruising noted under eyes bilaterally

**Cardiovascular**: Skin warm, dry, pink, capillary refill less than 2 seconds. No edema noted. Peripheral pulses equal and strong bilaterally. Heart rate within normal limits.

**Respiratory**: Airway clear and respiratory effort unlabored. Patient denies cough. Breath sounds are clear bilaterally to auscultation.

**Musculoskeletal**: Denies musculoskeletal pain, numbness or tingling. No swelling or deformity noted. Distal pulses intact. Full ROM of extremities. No ecchymosis noted. Patient rates pain as 10 on a one-to-ten scale with ten as the worst pain ever. pt states he hurts all over. Denies any injury

**Genitourinary**: Denies dysuria, frequency, or burning with urination. Denies discharge from genitalia.


**Reassessment**: 03/28/2011 17:06 RMR
**Adult Reassessment -**
**Time**: The patient was reassessed at 16:50.
**Safety**: Bedrails are up to protect patient from fall. Call light is within reach and patient or family was instructed on use. Bed height is at the lowest position.
**Pain**: Patient rates pain as 10 on a one to ten scale with ten as the worst pain ever. Pain is located in the chest, and allover, also now c/o numbness left face, requesting pain medication MD at bedside, refused to give pt narcotics, pt verbally abusive at times..

Helena Regional Medical Center
1801 Martin Luther King Dr, Helena, AR 72342
1-870-338-5800
Patient: WILLIAMS, AL   DOB: 11/17/1969 Patient #: 898265 MRN: 000130631 Date In: 3/28/2011

**Reassessment:** 03/28/2011 18:05 RMR

**Adult Reassessment -**

**Time:** The patient was reassessed at 18:00.

**Safety:** Bedrails are up to protect patient from fall. Call light is within reach and patient or family was instructed on use. Bed height is at the lowest position.

**Pain:** Patient rates pain as 10 on a one to ten scale with ten as the worst pain ever. Pain is located in the all over.

**Neurological:** Alert, oriented to person, place and time. Glascow Coma Score 15. Moves all four extremities equally with equal strength. Patient denies numbness or tingling. Pupils are brisk, equal, and reactive to light bilaterally. pt is requesting copy of his medical records from this vist and previous vist last week, instructed pt that he will have to go to medical records dept and sign a release form for a copy of his charts. That we cannot give to him from the ER.

**Cardiovascular:** Skin warm, dry, pink, capillary refill less than 2 seconds. No edema noted. Peripheral pulses equal and strong bilaterally. Heart rate within normal limits.

**Respiratory:** Airway clear and respiratory effort unlabored. Patient denies cough. Breath sounds are clear bilaterally to auscultation.


**Nursing Diagnosis** 03/28/2011 16:07 RMR

**General:** Alteration in comfort identified 03/28/2011 15:45. Goal to resolve is: decrease in pain level. Unresolved.


**Treatments** 03/28/2011 16:29 RMR

**SC Insulin Reg Dosage 20 units left upper arm initiated at 03/28/2011 16:25 by RMR. [Transcribed][AL1]:**

Reassessed at 03/28/2011 17:26 [RMR] -  accucheck 388 - RMR


**\*\*IV Insertion started to the L hand, with a 20 gauge catheter, Hep Lock, 1 attempt initiated at 03/28/2011 16:50 by RMR. [Transcribed][AL1]:**

Reassessed at 03/28/2011 17:07 [RMR] -  IV access remains patent.  - RMR

Reassessed at 03/28/2011 18:22 [RMR] -  IV discontinued at 03/28/2011 18:22, with no bleeding, catheter intact, dressing applied.  - RMR


**NS 1000 ml bolus in the left hand, given for therapeutic reasons initiated at 03/28/2011 16:50 by RMR. [Transcribed][AL1]:**

Reassessed at 03/28/2011 17:07 [RMR] -  Infusing without signs of infiltration. Current rate is 999 mls per hour.  - RMR

Reassessed at 03/28/2011 17:26 [RMR] -  bolus complete - RMR


**Glucose Scan(finger stick) 388 initiated at 03/28/2011 17:22 by RMR. [Transcribed][AL1]:**

Reassessed at 03/28/2011 17:26 [RMR] -  reported to MD - RMR


**SC Insulin Reg 10 units right upper arm initiated at 03/28/2011 18:00 by RMR.**

**[Transcribed][AL1]:**

Reassessed at 03/28/2011 18:23 [RMR] - no signs of hypo/hyperglycemia - RMR

**Disposition** 03/28/2011 18:29 RMR

**Discharge**: Patient left the department at 03/28/2011 18:23. Patient's disposition is: D/C- POLICE. Discharge instructions were given to the patient and given to a family member and and police officer. The patient, family member with patient, person accompanying patient verbalizes understanding of the discharge instructions. The condition at discharge is stable. Vital signs taken at 17:00 were: T: 98.2 PO, P: 96 and is regular, R: 18 and unlabored, BP: 165/078, O2 Sat: 99 on RA, pain level is 10 on a 1-10 scale in the all over. Medication reconciliation documentation was completed. Pain is unchanged. pt ambulated in shackles out of dept without incident, spouse and police officer in attendance.Belongings taken by the patient.


REGINA ROBINSON RN All text in this document clearly marked by RMR has been authored and legally signed by use of electronic device. 03/28/2011 18:40

Helena Regional Medical Center
1801 Martin Luther King Dr, Helena, AR 72342
1-870-338-5800
**Patient: WILLIAMS, AL   DOB: 11/17/1969  Patient #: 898265 MRN: 000130631  Date In: 3/28/2011**

| | |
|---|---|
| Department: Labs | 5 |
| Adult Assessment | 20 |
| Neurological | 5 |
| Tx: **IV Insertion | 15 |
| Adult Reassessment | 15 |
| Tx: Glucose Scan(finger stick) | 10 |
| Adult Reassessment | 15 |
| Neurological | 5 |
| Discharge instructions | 10 |
| Vital Signs | 5 |
| Total Points: | 105 |

Helena Regional Medical Center
1801 Martin Luther King Dr, Helena, AR 72342
1-870-338-5800
Patient: WILLIAMS, AL   DOB: 11/17/1969   Patient #: 898265   MRN: 000130631   Date In: 03/28/2011
Discharge Instructions

## Illness/Injury & Medicine Topics
DIABETES (English)
HYPERGLYCEMIA (English)
CONTUSIONS (English)

### Special Instructions

Return to jail, follow up with Dr. Webber in office in 1-2 days for prescripti
for all meedications. Return to ER for emergent needs. Follow up with optometr
for recheck of eyes in 2-3 days.

Referred to:

Webber, David, DO
Phone:(870)338-9244
504 Pecan Helena, AR 72342

Follow up in 1 days

Your emergency care provider today was: **LEVY, ARTHUR, MD**

### Acknowledgement

I have received and I understand the instructions as described above.

X _____        _____
Patient or Guardian                         Staff

__3/28/11_____                  __18:23_____
Date                                           Time

# HELENA REGIONAL MEDICAL CENTER

## GENERAL INFORMATION

PT NAME:  WILLIAMS AL
ADMIT DATE/TIME: 03/30/11 17:05
DISCHARGE DATE/TIME:
ADMIT MD:  PILLOW EDWARD L
ER/ATTEND MD: PILLOW EDWARD L
PCP MD:
REASON FOR VISIT:
HYPERGLYCEMIA
COMMENTS:

ACCT#:0898430

**CORRECTED COPY**

VIP: N
REC TYPE:
LOCATION:
ROOM/BED:120/1

ADM PRIORITY:
ADM SOURCE: 1

CONFIDENTIAL: Y
MR#: 000130631
SERV: OBS
CLERK:SSM
PT TYPE/ACCOM: O

MRSA/ISOLATION:

## PATIENT DEMOGRAPHICS

STREET: 1003 PHILLIPS 300 RD
CITY:    WEST HELENA      AR
ZIP:     72390
HOME PHONE: (731)420-3584

DOB/AGE:11/17/1969   41
SEX: M
MAR STATUS: S

SS#: 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
RELIG: U
BIRTH PLACE:

| NEXT OF KIN | PERSON TO NOTIFY | VISIT HISTORY |
|---|---|---|
| RELAT TO PT: 01 SPOUSE<br>NAME:    WILLIAMS CAROLYN<br>STREET:  1003 PHILLIPS 300 RD<br>CITY/ST: WEST HELENA      AR<br>ZIP:     72390<br>H- (870)995-7764 W- (000)    - | RELAT TO PT: 32 MOTHER<br>NAME:    CHESTNUT DOROTHY<br>STREET:<br>CITY/ST:<br>ZIP:<br>H-(870)829-1141  W-(000)    - | LST DATE: 03/28/11<br>LST SRVCD:<br><br><br>OCCUR CD:  11<br>DT OF INJ: 03/30/11 |

## EMPLOYER & GUARANTOR INFORMATION

PT EMPLOYER:
ADDRESS:
CITY/STATE:
ZIP CODE:
PHONE:

GUARANTOR:WILLIAMS AL
GRNTOR EMP:
ADDRESS:  1003 PHILLIPS 300 RD
CITY/STATE: WEST HELENA      AR
ZIP CODE:   72390
PHONE:  (731)420-3584
REL TO PAT: 18  SELF

SS#: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

## INSURANCE COVERAGE INFORMATION

PRIM INS:  SELF PAY O P
ADDRESS:   1003 PHILLIPS 300 RD

CITY/STATE:WEST HELENA      AR
ZIP CODE:  72390
PHONE:     (731)420-3584

POLICY#:   430395344
GROUP#:
AUTH#:
EMPLOYER:
INSUREDS NAME: WILLIAMS AL
REL TO PAT:   18 SELF
DOB: 11/17/1969

F/C: S

SECD INS:
ADDRESS:

CITY/STATE:
ZIP CODE:
PHONE:

POLICY#:
GROUP#:
AUTH#:
EMPLOYER:
INSUREDS NAME:
REL TO PAT:
DOB:

---

ER HMO AUTHORIZATION      YES _____ NO _____

BY _____   TIME _____

O.O.T _____   PGR PROTOCAL _____

ER HMO AUTHORIZATION      YES _____ NO _____

BY _____   TIME _____

O.O.T _____   PGR PROTOCAL _____

---

ASSEMBLED _____

CODED/ABSTRACTED _____

ANALYZED _____

DIAGNOSIS CODES

PROCEDURE CODES

---



0898430   000130631    OBS    03/30/11   17:05

DATE PRINTED: 03/31/11

Date:  4/05/11
Time: 14:57:45

PATIENT NAME: WILLIAMS AL                              AGE: 41          SEX: MALE
PATIENT NO: 0898430        CHART NO: 000130631         HISTORY NO:  000130631
ADMISSION DATE:  3/30/11   DISCHARGE DATE:  3/31/11
FC: S  SELF PAY / UNKNOWN  SRV:050 OBSERVATION
PHYSICIAN: 00045           DISCHARGE STATUS:  01  DISCHARGED HOME/SELF CARE


FINAL DIAGNOSES                                                          ICD-9
     Coded by         JSCOTT13                                           CODE


PRINCIPAL DIAGNOSIS
     DMII WO CMP NT ST UNCNTR                                            25000

SECONDARY DIAGNOSES
     LONG-TERM USE OF INSULIN                                            V5867
     HYPERTENSION NOS                                                    4019
     CONJUNCTIVITIS NOS                                                  37230
     EPILEP NOS W/O INTR EPIL                                            34590
     ESOPHAGEAL REFLUX                                                   53081
     LONG-TERM USE MEDS NEC                                              V5869

8. **GENERAL CONSENT FOR TESTS, TREATMENT, PHOTO, VIDEO, AND SERVICES (continued from front):**
I consent to examinations, blood tests (including blood tests for communicable diseases such as hepatitis and HIV/AIDS when healthcare personnel have been exposed to my blood and/or body fluids), laboratory and imaging procedures, medications, infusions, nursing care and other services or treatments rendered by my physician, consulting physicians, fellows, residents, interns, and their associates and assistants, or rendered by Facility personnel under the instructions, orders or direction of such physician(s), fellow(s), resident(s), or intern(s).

I agree and understand that all physicians (including fellows, residents, and interns), dentists, oral surgeons, and podiatrists involved in my care in any way are responsible and liable for their own acts and omissions, and the Facility is not responsible or liable for the acts or omissions of the aforementioned. Services may be performed by independent contractors who are not employed by the Facility. I am aware that the practice of medicine is not an exact science and further understand that no guarantee has been or can be made as to the results of the treatments, care or examinations in the Facility.

I have been informed of the treatment procedures considered necessary for me and that the treatments/procedures will be directed by a physician and may be performed by such physician and/or one or more additional physicians, fellows, residents, interns, and employees of the Facility. I understand that one or more physicians, fellows, residents, and/or interns at the Facility may treat me or participate in my treatment. I understand that no guarantee or assurance has been made regarding (1) which physicians and/or fellows, residents, or interns will treat me or participate in my treatment and/or (2) the results that may be obtained from treatment.

*patient initials*   I consent to the photographing or videotaping, including appropriate portions of my body, for medical and medical record documentation purposes, provided said photographs or videotapes are maintained and released in accordance with protected health information regulations.

9. **ADVANCE DIRECTIVE ACKNOWLEDGEMENT:**
Federal law requires that patients be provided information about their rights to make advance health care decisions, including a Living Will, Durable Medical Power of Attorney or designation of a surrogate decision maker for healthcare decisions. If you have already completed any of these documents, please inform your physician and the Facility.   ***Please check one:***

❏ I have executed an advance directive and have supplied a copy to the Facility.
❏ I have executed an advance directive and have been requested to supply a copy to the Facility.
❏ I have reviewed the directive(s) on file with this Facility and it is / they are my current directive(s).
❏ I have not executed an advance directive. I have received information about advance directives from this Facility.
❏ I have not executed an advance directive. I have requested advance directive information from this Facility.
☒ I have not executed any advance directives, and I do not wish to receive information about advance directives from this Facility.

10. **RESEARCH STUDIES:**   ***Please check one:***
☒ No ❏ Yes   Are you currently a participant in any research study or project: *If yes, please briefly describe what is being studied (drug, medical device or other)* _____
Who can the Facility contact with questions about the study? _____

11. **SMOKING CESSATION INFORMATION:**   *Non Smoker*
❏ Upon admission, I received the Smoking Cessation Information Packet, which includes information on: health risks associated with smoking, community resources for smoking cessation programs and health risks associated with second hand smoke. If I have further interest in smoking cessation programs and education, I will request additional information from the facility staff or my physician.

| The undersigned certifies that s/he has read the foregoing, understands it, accepts its terms, has received a copy of it and is the patient or is duly authorized by the patient as their agent to execute the above. | | |
|---|---|---|
| Patient's Signature or Legal Representative | Date 3-30-11 | Time 15:20 |
| Relationship to Patient | Interpreter, if utilized | |
| Witness Signature | If Telephone Consent, Second Witness' Signature | |

Inpatient / Outpatient Conditions of Admission
and Consent to Medical Treatment
ADM-1701G - Back   (Rev. 01/10)

*Patient Label*

HELENA REGIONAL MEDICAL CENTER
WILLIAMS AL          HSV:EOP
Admit: 03/30/11 Med Rec #: 000130631
Adm Dr.: MING JEFFREY A
DOB:11/17/1969  41  Sex: M RM#:   /
            Pat #:0898430



Rm# 120

*1PO*

| ALLERGIES & SENSITIVITIES | ☐ No Known Allergies | WEIGHT:_____ ☐ lb ☐ kg | HEIGHT:_____ ☐ in ☐ cm |
|---|---|---|---|
| **DRUG** | **REACTION** | **DRUG** | **REACTION** |
| 1. Codeine | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

| Date | Time | [ ] Another brand of drug identical in form and content may be dispensed unless checked | Verbal/Telephone Order Read Back ( ) ✓ ( ) Initial | Nurse, Date, & Time |
|---|---|---|---|---|

## COMPLETE THIS SECTION FOR ADMISSION ORDERS ONLY!

☒ Admit to Inpatient  
☐ Place in Observation  
☐ Outpatient  

UNIT *(check one)*:  
☒ Med/Surg ☐ Med-Telemetry ☐ ICU ☐ OB/L&D  
☐ Other _____

3-30-11 5:05p 1) Admit to Dr. Nes Pillow.
2) Dx: ① Hyperglycemia, ② HTN, ③ left eye irritation
3) 1800 Cal ADA, NAS diet, # 1400
4) Vitals q shift or prn
5) Bed rest, BRP c assistance, foley if needed
6) IV N/S, 1 L bolus, then 1 L at 150 cc/hr, then 1 L
 c 20 meq KCl at 125 cc/hr.
7) Old chart
8) O₂ by N/c at 2-3 l/min prn SOB # 1500
9) IC 2° list routine meds
10) Use tight sliding scale
11) Tylenol 1 g po q 4-6 hrs prn pain or temp >101°F
12) Zofran 4 mg IV q 4-6 hrs prn N/V.
13) Catapress 0.2 po q 4 hrs prn systolic >150 or
 diastolic > 90, & notify M.D.
14) Seizure precaution # 1800
15) CBC, BMP, Mg, PO4, dilantin level
16) Repeat dilantin level at 6 AM #1400
17) Valium 2-5 mg IV slowly prn seizure activity & notify m.d.

Nakota Brewster US
3/30/11

3/30/11 Omeprazole 20mg po daily
8:36
T/O Dr. N. pillow/ read back/ Glen Slater

FAXED

Noted 3/30/11 Glen Slater 3/30/11

---

Physician Admission Orders  
NS-2701 (Rev. 09/09) Page 1 of 1

HELENA REGIONAL MEDICAL CENTER
WILLIAMS AL          HSV:EOP
Admit: 03/30/11 Med Rec #: 000130631
Adm Dr.: MING JEFFREY A
DOB:11/17/1969  41  Sex: M RM#:   /
Pat #:0898430

# Helena Regional
### MEDICAL ✚ CENTER

## Medication Reconciliation Admission/Discharge List
### (Include Herbals, OTC Medications and Vitamins)

Admission Ht. _6_ *Pt*   Admission Wt. _200_ *lb* ☐actual ☐stated

Allergies: _codiene_

Medicine list obtained from: ☐Prescription Bottle ☑Patient ☐Family ☐Other   "Pt has church out of

☑Medication or list not brought in with patient.   town that helps provide his

Pharmacy _Out of town Pharmacy_   mediat..."

| Home Medication | Dose | Route | Frequency | Date of Last Dose | Time of Last Dose | Nurse's Initial | Continue at discharge YES | NO |
|---|---|---|---|---|---|---|---|---|
| Lantus | 36 units | SubQ | Nightly | 3/26/11 | PM | SM | ✓ | |
| Humulin 70/30 | 40 units | SubQ | morning | 3/26/11 | AM | SM | ✓ | |
| Humulin 70/30 | 42 units | SubQ | nightly | 3/26/11 | PM | SM | ✓ | |
| Regular insulin | based on carbs | SubQ | given based on carbs | 3/26/11 | PM | SM | ✓ | |
| Haldol | 20mg | by mouth | 2x day | 3/26/11 | PM | SM | | ✓ |
| Xanax | 0.25mg / 30mg? | by mouth | as needed | 3/26/11 | PM | SM | | ✓ |
| Nexium | 40mg | by mouth | daily | 3/26/11 | AM | SM | ✓ | |
| Benadryl | 50mg | by mouth | as needed | 3/26/11 | PM | SM | ✓ | |
| Amlodipine | 5mg unknown | by mouth | daily | 3/26/11 | AM | SM | ✓ | |
| Dilantin | 100mg unknown | by mouth | 2x day | 3/26/11 | AM | SM | ✓ | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Nurse's Signature: _S Martin RN_   Date: _3/30/11_   Time: _1530_

_____   Date: _____   Time: _____

_____   Date: _____   Time: _____

_____   Date: _____   Time: _____

### Prescriptions for New Medications Given at Discharge

| Medication | Dosage | Route | Frequency |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

☐Personal Meds Stored in Pharmacy.   Medicine sent home with ☐Patient ☐other _____ (name)

Discharging Nurse's Signature: _Q Shackelford RN_   Date: _3/31/11_   Time: _0900_

### **FAX MEDICATION LIST TO PHARMACY***

Original - Place in Chart   Copy- To patient at discharge

176-1410667   9/08

HELENA REGIONAL MEDICAL CENTER
WILLIAMS AL
Admit: 03/30/11 Med Rec   HSV:EOP
Adm Dr.: MING JEFFREY A   #: 000130631
DOB:11/17/1969  41  Sex: M RM#:   /
Pat #:0898430

**Helena Regional Medical Center**
1801 Martin Luther King Drive
Helena, AR   72342
870 338 5800

## SHORT STAY REPORT

---

**Name:  WILLIAMS, AL**

| | | | | | |
|---|---|---|---|---|---|
| MRN: | 130631 | Room#: | | DOB: | 11/17/1969 |
| Account #: | 898430 | Bed#: | | Age: | 41 Y |
| Service Code: | OBS | | | Sex: | M |
| ADM DATE: | 03/30/2011 | | | DIS DATE: | 03/31/2011 |

Dictated By:              EDWARD L PILLOW, MD
Attending Physician:    PILLOW, EDWARD L
Primary Care Physician:  MING, JEFFREY

---

ADMISSION DIAGNOSES:
1. Hyperglycemia.
2. Hypertension.
3. Conjunctivitis.

DISCHARGE DIAGNOSES:
1. Hyperglycemia.
2. Hypertension.
3. Conjunctivitis.

PRESENTATION/HOSPITAL COURSE:  The patient is a pleasant 41-year-old gentleman with a past medical history remarkable for diabetes, hypertension, gastroesophageal reflux disease, seizure disorder, who presented to the emergency room on the day of admission complaining of weakness as well as elevated blood sugars.  The patient states that he was recently incarcerated in our in county and while he was at the jail did not receive his usual medications which include insulin.  After he was released, he subsequently presented to our ER due to fear that he had elevated blood sugars and with dizziness.  At presentation, his initial workup revealed an elevated blood sugar of 647.  He also had a serum ketone level that returned as negative.  His Dilantin was therapeutic at 10.1.  He was admitted with the diagnosis of hyperglycemia, for insulin and IV fluid administration.  After admission, he had an IV placed.  He was started on IV fluids at 125 cc an hour.  He was also placed on sliding scale insulin with Accu-Cheks a.c. and h.s.  His blood sugar subsequently improved while he was on the IV fluids and p.r.n. regular insulin.  His dizziness resolved, and at the time of my exam on the morning of the 31st, his main complaint is pain in his back right molar that he states was broken when he fell in prison.  The patient states that his medications are in Memphis, where he is from, and currently he has no medications in Helena.  He requests that I call his medicines into Fred's Pharmacy.

PAST MEDICAL HISTORY:
1. Type 2 diabetes.
2. Hypertension.
3. Seizure disorder.
4. Gastroesophageal reflux disease.

PAST SURGICAL HISTORY:  Unknown.

SOCIAL HISTORY:  Lives in Memphis, Tennessee.

FAMILY HISTORY:  Noncontributory.

## FINAL CHART COPY
Page 1 of 2



| ALLERGIES & SENSITIVITIES | ☐ No Known Allergies | WEIGHT:_____ ☐ lb ☐ kg | HEIGHT:_____ ☐ in ☐ cm |
|---|---|---|---|
| **DRUG** | **REACTION** | **DRUG** | **REACTION** |
| 1. | | 4. | |
| 2. | | 5. | |
| 3. | | 6. | |

| Date | Time | [ ] Another brand of drug identical in form and content may be dispensed unless checked | Verbal/Telephone Order Read Back ( ) ✓ ( ) Initial | Nurse, Date, & Time |
|---|---|---|---|---|
| | | **COMPLETE THIS SECTION FOR ADMISSION ORDERS ONLY!** | | |

☐ Admit to Inpatient       UNIT (check one):
☒ Place in Observation     ☒ Med/Surg  ☐ Med-Telemetry  ☐ ICU  ☐ OB/L&D
☐ Outpatient               ☐ Other _____

3/31/11
0835

Discharge Home
meds:
Lantus 36u aHs
70/30 46u Am / 42 u Pm
Haldol 20 mg BID
Nexium 40mg daily
Amlodipine 5mg daily
Dilantin 100 mg BID
F/u PCP 1 wk

N Pillow

A Hodgens
3/31/11
0852

Fredh W#

noted o Shadaeijrd Rn 3/31/11 @ 0900

Physician Admission Orders
NS-2701     (Rev. 09/09)     Page 1 of 1



HELENA REGIONAL MEDICAL CENTER     HSV:MIP
WILLIAMS AL
Admit: 03/30/11 Med Rec #: 000130631
Adm Dr.: PILLOW EDWARD L
DOB:11/17/1969   41   Sex: M RM#:120/1
                            Pat #:0898430

Patient Label



## Helena Regional
### MEDICAL ✚ CENTER

### Critical Results
## READ BACK VERIFICATION RECORD

| Date | Time Results Received | Critical Test | Value | Name of MD | Time MD Notified | Reason MD Not Notified * See Below | RBV (check box) | Signature |
|------|------|------|------|------|------|------|------|------|
| 3/30/11 | 1640 | Glucose | 647 | Ming | 1640 | | ☒ | SMartin RN |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |
| | | | | | | | ☐ | |

**Legends for reasons MD was not notified:**
1. **Patient on Heparin Protocol**
2. **Patient on Diabetic Protocol**
3. **Improving from previous reported lab value**
4. **MD is aware of condition and is treating**

*Original remains on patient record; send yellow copy to Quality Department at discharge.*

```
HELENA REGIONAL MEDICAL CENTER
WILLIAMS AL              HSV:EOP
Admit: 03/30/11 Med Rec #: 000130631
Adm Dr.: MING JEFFREY A
DOB:11/17/1969  41  Sex: M RM#:   /
                    Pat #:0898430
```

# INITIAL ASSESSMENT FORM

**Helena Regional Medical Center**

| | | | | |
|---|---|---|---|---|
| PRIORITY: **3** | | Patient: **WILLIAMS, AL** | | Pt#: 898430 |
| **Urgent** | | DOB: 11/17/1969 | AGE: 41YRS  Sex: M | MR#: 000130631 |
| | | EDP: MING, JEFFREY, MD | | Worker's Comp: |
| DATE: 03/30/2011 | | PCP: MING, JEFFREY, MD | | Emp. Referred: |

| Presentation Time: 15:16 | Triage Time: 15:20 | Arrival Mode: AMB - POV |
|---|---|---|

| Height: 6 ' " | Weight: 200 lbs. 0 oz. 90.91 kgs. LMP:N/A | Last Tetanus: N/A | Acc By: alone |
|---|---|---|---|

| | | | Vital Signs |
|---|---|---|---|
| Chief Complaint: | HYPERTENSION--REPORTED HYPERGLYCEMIA--DIABETES | | T: 96.2 PO |
| Brief Assessment: | Pt to ER with c/o possible high blood sugar. States that he just got out of jail and has not had his blood pressure meds, seizure meds, or insulin. C/o constant pain to his left eye and tooth from accident in jail. | | P: 123 regular |

**Vital Signs**

| | |
|---|---|
| T: | 96.2  PO |
| P: | 123  regular |
| R: | 18  unlabored |
| BP: | 172/115 |
| O2: | % RA  N.C. |

Pain Intensity Scale: 10 / 10
Pain Location: multiple areas

| | | | | |
|---|---|---|---|---|
| NIGHT SWEATS | NO | HEMOPTYSIS | NO | |
| WEIGHT LOSS | NO | FEVER | NO | |
| ANOREXIA | NO | | | |

| | | | |
|---|---|---|---|
| NAUSEA | YES | HX OF HYPERTENSION | YES |
| ABUSE SUSPECTED | NO | TAKE PRESCRIBED MEDS | NO |
| PNEUMONIA VACCINE W/I 5 YRS | NO | HEADACHE | NO |
| FLU VACCINE THIS SEASON | NO | | |
| BEST NUMBER TO CALL | NO | | |
| RECENT WEIGHT LOSS | NO | | |
| INCREASE IN THIRST | YES | | |
| VOIDING FREQUENTLY | YES | | |
| INCREASE IN APPETITE | YES | | |
| RECENT ILLNESS/INFECTIONS | NO | | |
| DIZZINESS | YES | | |
| DIFFICULTY SEEING | YES | | |

Sudden Onset:

Pre-Hospital Treatment:

Pediatric Assessment: N/A

Past Medical History: Anxiety, High cholesterol, HTN, IDDM, Panic attacks, Schizo, Seizures

## Allergies: Codeine

Medicines: see list,

Nurse Signature: _____  MSM

Additional Notes: _____

**Adult Assessment** 03/30/2011 15:54 MSM

**Room Assignment**: Patient assigned to room 6. Patient arrived in room ambulatory. Patient moved to room at 15:20. Time of primary assessment: 15:20.

**Psychosocial**: Patient's behavior is inappropriate and appears anxious, nervous. Patient currently lives with family. Support systems include no one. Patient ambulates independently. Performs ADL's independently. Nutritional status is normal by appearance. States there are no religious or cultural beliefs that may impact the care delivered. Appears to be normally interacting with care giver(s) or others that are present. The patient exhibits behavior, which indicates a readiness to learn new material.

**Safety**: Bedrails are in the upright position to protect patient from fall. Call light is within reach and patient or family was instructed on use. Bed height is at the lowest position. Patient is at risk for fall as evidenced by: other health history to include - hypertension, medication history that includes - antihypertensives. Falls prevention plan implemented and maintained during ED visit.

**Pain**: Patient rates pain as 10 on a one-to-ten scale with ten as the worst pain ever. Pain is located in the left eye and bottom right teeth. Onset of pain was was 2-4 days ago. Patient describes the pain as constant. Pain is exacerbated by nothing. Pain is improved or comfort is provided by nothing.

**Neurological**: Alert, oriented to person, place and time. Glascow Coma Score 15. Moves all four extremities equally with equal strength. Patient denies numbness or tingling. Pupils are brisk, equal, and reactive to light bilaterally. Patient is able to speak clearly.

**Cardiovascular**: Heart rate is 123. Electronic non-invasive blood pressure monitor attached to patient. The skin appears normal, warm, and dry. Capillary refill is less than 2 seconds. Edema is not present. Chest wall is non-tender to touch, observed as symmetrical.

**Respiratory**: Airway clear and respiratory effort unlabored. Patient denies cough. Breath sounds are clear bilaterally to auscultation.

**EENT: Eyes** - Visual disturbances are described as cloudy, in the left eye. Injury caused by penetrating trauma from altercation while in jail. EOM's are intact. Patient describes pain to eyes as to left eye, sharp. Sclera of left eye is red. **Dental** - Complains of toothache localized to right, lower oral cavity. Denies recent history of dental work. States hx of trauma to teeth/mouth while in jail, he fell and has been having pain every since th fall. Appearance of the teeth and oral cavity reveals dental carie(s) present.

**Reassessment:** 03/30/2011 16:00 MSM
**Family**: Family or significant other(s) at bedside at 15:30.

**Reassessment:** 03/30/2011 17:40 MSM
**Laboratory**: Specimen(s) collected at 17:30. Type of specimen collected was MRSA swab.

 

# TENNESSEE BOARD OF PROBATION AND PAROLE

Parole Violation Report - Notice of Charges

**DATE:** 03-25-2011

**TO:** Tennessee Board of Probation & Parole

**FROM PAROLE OFFICER:** Ronnie L. Hall

**OFFICE:** P79F1

| | | | |
|---|---|---|---|
| *Parolee:* | Al Williams | *TOMIS Number:* | 362773 |
| *Original Conviction:* | Second Degree Murder | | |
| *Original Sentence:* | 19 | *Parole Expires:* | 06/24/2019 |
| *Paroled From:* | NWCC | *Parole Date:* | 09/28/2010 |
| *Parole Type:* | TNP | *State:* | TN |
| *Commutation (Y/N):* | N | *Date of Commutation:* | |
| *Type(s) of Violation(s):* | New Charges | *Supervision Level:* | Max |

**How Violation Occurred:**     **In violation of Rule #2**                          **, which states:**

*I will obey the laws of the United States or any state, in which I may be, as well as any municipal ordinances.*

The above named parolee is allegedly in violation of  Rule #2          in that:

**Count:  01    On or about 3/22/11 subject committed the offense of Terroristic Threat. This is a Class D Felony per A.C.A. 5-13-301**

**Narrative:**     On 3/22/11, Michael Anderson, a resident of the state of Arkansas, submitted an affidavit to the Phillips Co., Arkansas Court stating that the subject threatened to kill him and his nephew.

**Count:  02    On or about 3/11/11 subject committed the offense of Criminal Mischief. This is a Class D Felony per A.C.A. 5-38-204**

**Narrative:**     On 3/11/11, Carolyn A. Smith, a resident of the state of Arkansas, submitted an affidavit to the Phillips Co. Arkansas Court stating that the subject threw a rock and brick and broke out her window in her 2003 Chevy Yukon and threatened to kill her several times.

**How Violation Occurred:**     **In violation of Rule #6**                          **, which states:**

*I will get the permission of my Probation/Parole Officer before changing my residence or employment, or before leaving the county of my residence or the state.*

The above named parolee is allegedly in violation of  Rule #6          in that:

**Count:  01    On or about 3/18/11 offender moved without the knowledge or the consent of the officer.**

**Narrative:**     On 1/21/11 the subject reported his residence as 1768 Pendelton Place # 3, Memphis, TN on his monthly reporting form. On 3/18/11, a home visit was conducted to 1768 Pendelton Place # 3, Memphis, TN. An unidentified black female at the residence stated that the subject lived at the residence but was not at home. The subject's supervising officer visited the leasing office at Pendelton Place in an attempt to ascertain whether the subject was living at 1768 Penedelton Place # 3, and whether he was permitted to live there whereupon it was discovered that the subject's name was not on the rental agreement and that he was not permitted to live there per the rules of property ownership. Only individuals listed on the lease agreement are permitted to live on the property. Anyone not following the rules is subject to eviction.. On or about 3/22/11, the subject's supervising officer received a call from a person identifying herself at Ms Anderson, the leasee of 1768 Pendelton Place # 3, Memphis, TN. Ms Anderson stated  that the subject did not live there and had never lived there although he had mail coming to that address which she did not permit him to do. On 3/24/11 the subject reported to his supervising officer and completed a monthly reporting form upon which he listed his address as 1764 Pendelton Place # 3, Memphis, TN.

**Count:  02    On or about 3/22/11 subject left the state without the knowledge or permission of the officer.**

**Narrative:**     On or about 3/22/11 the subject's supervising officer received calls from Sheriff Ronnie White and Chief Deputy David Lawman , Phillips Co. Arkansas, advising that the subject had been in Arkansas during the past month and that criminal charges would be filed against him and that details would be forwarded to Tennessee. On 3/25/11 the subject's



EXHIBIT
G

 **TENNESSEE BOARD OF PROBATION AND PAROLE** 

Parole Violation Report - Notice of Charges

supervising officer received documentation from the Tennessee Compact Office of the charges pending against the subject in Arkansas on or about March 16, 2011.

**How Violation Occurred:**      **In violation of Rule #12**          **, which states:**

*I will not engage in any assaultive, abusive, threatening or intimidating behavior. Nor will I participate in any criminal street gang related activities as defined by TCA 40-35-121. I will not behave in a manner that poses a threat to others or myself.*

The above named parolee is allegedly in violation of  Rule #12          in that:

**Count:  1**     **On or about 3/22/11 subject committed the offense of Terroristic Threat. This is a Class D Felony per A.C.A. 5-13-301**

Narrative:     On 3/22/11, Michael Anderson, a resident of the state of Arkansas, submitted an affidavit to the Phillips Co., Arkansas Court stating that the subject threatened to kill him and his nephew.

**Count:  2**     **On or about 3/11/11 subject committed the offense of Criminal Mischief. This is a Class D Felony per A.C.A. 5-38-204**

Narrative:     On 3/11/11, Carolyn A. Smith, a resident of the state of Arkansas, submitted an affidavit to the Philips Co. Arkansas Court stating that the subject threw a rock and brick and broke out her window in her 2003 Chevy Yukon and threatened to kill her several times.

Submitted by: _____     Reviewed by: *Mr. Shaundra Wil*

STATE OF ARKANSAS )
COUNTY OF PHILLIPS )

**RETURN OF SUMMONS**
**& PROOF OF SERVICE**

Carolyn A. Smith

vs

NO. _DR 2011-92_

Al Williams

On this _22nd_ day of _March_, 20 11 , at _3:00_ o'clock a.m. (p.m.)
I have duly served the following papers/documents: _Ex Parte Order of Protection_
_Petition for Order of protection_, on the defendant/respondent, at the
following location, to-wit: _1003 PC 300 Rd West Helena, Ark_ by
the following method:

**PERSON SERVED:** A true and correct copy of the aforesaid papers were served on the above-named
party, to-wit: _Al L Williams_ in the following manner:

___✓___ By personally delivering them into the hands of aforementioned person.

_____ (Substituted service) By leaving a copy of the papers at his/her dwelling house or usual place
of abode with some person residing therein who is at least 14 years of age, that person's
name and relationship to the above-named party being:

_____          _____
(Name)                           (Relationship to defendant)

_____ By delivering a copy thereof to an agent authorized by appointment or by law to receive
service of summons, to-wit:

_____
(Name and Title)

___✓___ To the best of my knowledge and belief, said person was not engaged in the U.S. Military at
the time of service of process.

_____ AFTER DUE AND DILIGENT EFFORTS, UNDERSIGNED WAS UNABLE TO EFFECT
SERVICE.

**DESCRIPTION OF**
**PERSON RECEIVING**
**DOCUMENTS:**

The person receiving the documents is described as follows:

Sex: _M_  Skin Color: _____  Hair Color: _Blk_  Facial Hair: _Mus_

Age: _41_  Height: _6'0"_  Weight: _200_

Distinguishing features: _____

| PROOF OF DUE DILIGENT ATTEMPT: | DATES OF SERVICE ATTEMPTED | TIME OF ATTEMPT | ADDRESS ATTEMPTED | REASON FOR NON-SERVICE |
|---|---|---|---|---|
| | | | | |
| | | | | |

RONNIE WHITE, PHILLIPS COUNTY SHERIFF

By: _____ Deputy Sheriff

EXHIBIT
H

3

☑ The Respondent is prohibited from initiating any contact with the victim(s) including but not limited to physical presence, telephonic, electronic, oral, written, visual, or video. Respondent also shall not use a third party to contact the victim(s) except by legal counsel or as authorized by law or court order.

☐ The Respondent is excluded from the Petitioner's residence and the immediate vicinity thereof.
*Petitioner's Address:* _1003   PC 300 Rd  West Helen_ (or)

☐ The Petitioner's address is excluded from notice to the Respondent.

☐ The Respondent is prohibited from the following places:

**Petitioner's Workplace:** _____

**School:** _____

**Other (Identify):** _____

_____

☐ _____ is awarded temporary custody of minor child(ren).

(Names) _____

☐ Any law enforcement officer with jurisdiction is ordered to assist the Petitioner in gaining possession of the dwelling and/or to otherwise assist in execution or service of the Order of Protection.

☑ **Other Orders:** _____

_____

_____

If the parties (or other persons named herein) are subject to the jurisdiction of another court (i.e. through a divorce or paternity action), upon proper notice and the opportunity to be heard, said court may amend the terms of this Order as appropriate.

On this _11th_ day of _March_ , 2_011_ , IT IS ORDERED.

_____
CIRCUIT JUDGE

Office of the Circuit Clerk, Phillips County, 620 Cherry St., Helena-West Helena,  AR,
72342    Phone: 870-338-5515

-Pursuant to A.C.A. §9-15-207, a violation of an Order of Protection is a Class A misdemeanor carrying a maximum
penalty of one year imprisonment in the county jail or a fine of up to $2,500, or both. A violation of an Order of
Protection under this section within five (5) years of a previous conviction for violation of an Order of Protection is a
Class D felony punishable by up to six years in prison or up to a $10,000 fine or both.

-It is a federal offense for an individual who is subject to a Final Order of Protection or convicted of a misdemeanor of
domestic violence to ship, transport, or possess a firearm or ammunition pursuant to U.S.C. §922(g)8) and (9).

-Crossing state, territorial, or tribal boundaries to violate this Order may result in federal imprisonment pursuant to
18 U.S.C. §2262.

## NOTICE TO LAW ENFORCEMENT

-This Order of Protection is enforceable in every county of this state by any court or law enforcement officer. See
A.C.A. §9-15-207(g).

## PROOF OF SERVICE

Case #: __DR 2011-92_____        Court Date: __3/25/11_____

SERVED: Date: __3/22/11__    Time: __3:00 pm__    Place: __1003 PC 300 Rd West Helena__

Attempts Made: List only date and time

1) _____    2) _____    3) _____

_____    _____
Served On (Print Name)                                              Manner of Service

_____    _____
Served By (Print Name)                      Title                                Badge #

## DECLARATION OF SERVER

I declare, under penalty of perjury under the laws of the State of Arkansas that the foregoing information contained in the
proof of service is true and correct.

Executed on _____        _____
                    Date                                          Signature of Server

                                    _____
                                                       Address of Server

Page 3 of 3

RONNIE WHITE, SHERIFF

BY _____ **FILED**

DEPUTY

At 1:35 O'Clock P M

MAR 11 2011

LYNN STILLWELL
PHILLIPS COUNTY CIRCUIT CLERK
, Arkansas _____ D.O.
BY ____

# Ex Parte Order of **Protection**

☐ Amended Order

Case No. DR 2011-92

Circuit Court, Div. DOM REL.

County: **PHILLIPS**

**This Order is Effective Until:**

**FURTHER ORDERS OF THE COURT**

*Pursuant to Federal law, this Order shall be enforced by law enforcement officers in all states, territories, districts and tribal lands regardless of whether this Order of Protection is registered locally.*

## Petitioner/Plaintiff

CAROLYN A. Smith

First | Middle | Last

03-09-1961

Petitioner's Date of Birth (mm/dd/yyyy)

AA | F

Race | Sex

### Minor Children Protected under this Order

| | d.o.b. |
| | d.o.b. |
| | d.o.b. |
| | d.o.b. |

## Versus

### Respondent/Defendant

AL M. William

First | Middle | Last

Address: 501 West Main Marvel, AR

**Respondent Identifiers**

| Sex | Race | DOB mm/dd/yyyy | Ht. | Wt. |
|-----|------|----------------|-----|-----|
| M | AA | 11-17-64 | | |

| Eyes | Hair | SS# |
|------|------|-----|

| Phone # | DL # or other ID # |
|---------|---------------------|
| 431-420-8587 | |

**CAUTION:** ☐ Respondent possesses a firearm
☐ Respondent has history of extreme violence

**Relationship Identifiers:** ☒ Current or former spouses ☐ Parents of child(ren) in common
☐ Live together ☐ Current or past dating relationship ☐ Other Relative (Explain) _____

## THE COURT HEREBY FINDS AND OFFERS:

That there is jurisdiction over the parties and subject matter, and the Petitioner has presented sufficient evidence to show: 1.) that the victim(s) is (are) in immediate and present danger of domestic abuse or 2.) that the Respondent is scheduled to be released from incarceration within thirty(30) days, and upon the Respondent's release there will be an immediate and present danger of domestic abuse. That Ex Parte Temporary Order of Protection is hereby granted pursuant to the terms herein.

**The Respondent is ordered to appear before the Court on the** 2nd **day of** March **, 20** 11 **,
at** 9:00 a.m. **in the Courthouse located at** 620 Cherry St., Helena-West Helena, Arkansas, 72342.
If you fail to appear, the Court will likely make this Order permanent without further notice to you. The Respondent is hereby restrained from committing any criminal act against the victim(s) including, but not limited to: acts of violence or Domestic Abuse, A.C.A. §9-15-103(3); Harassment A.C.A. §5-71-208; Harassing Communications A.C.A. §5-71-209; Stalking A.C.A. §5-71-229; or Terroristic Threatening A.C.A. §5-13-301.

Page 1 of 3

B2011-3350



## IN THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS
### DOMESTIC RELATIONS DIVISION

Carolyn Smith                                                     **PETITIONER**

VS.                                      DR-2011- 9 2

AL M. William                                                    **RESPONDENT**

### ORDER OF DISMISSAL

On this 22ⁿᵈ day of July , 2011, comes on for hearing before the Court the

Petition for an Order of Protection under the Domestic Abuse Act and the Ex-Parte Order of Protection

entered by this Court, and the Court finds and concludes:

_Respondent petitioner_

_X_ That Petitioner has appeared in court and requested that this Petition be dismissed.
   fild a written Motion to dismiss

___ That the Petitioner and Respondent both have appeared in court and a request has
   been made that the petition be dismissed.

_X_ That the Petitioner and the Respondent have not appeared in Court.

___ That Respondent has appeared in court, but the Petitioner has failed to appear.

___ That this matter is not subject to the Domestic Abuse Act of Arkansas.

___ That Respondent can not be located for service of process.

___ That Petitioner has not sustained the burden of proof required for the issuance of a
   protective order

IT IS, THEREFORE, CONSIDERED, ORDERED AND ADJUDGED that the petition filed

herein be and same is hereby dismissed, and all costs (including filing fees and costs of service) in the

amount of $_____ payable to the Circuit Clerk's Office and $_____ payable to

the Sheriff's Office are to be paid by:

☐ Petitioner            ☐ Respondent            ☒ No costs are being assessed by the Court.

_____
CIRCUIT JUDGE

**FILED**
At 10:40 O'Clock A M

**JUL 2 2 2011**

LYNN STILLWELL
PHILLIPS COUNTY CIRCUIT CLERK
By_____ D.C.



**STATE OF ARKANSAS** )          **RETURN OF SUMMONS**
**COUNTY OF PHILLIPS** )          **& PROOF OF SERVICE**

Carly a Smith
_____

**VS**                                        NO. _DR-2011-92_

al Williams
_____

On this _3-28-11_ day of _March_, 20_11_, at _10:15_ o'clock a.m. / p.m.,
I have duly served the following papers/documents Order Continuing Ex Parte
Order of protection and Setting Date for Hearing on the defendant/respondent, at the
following location, to-wit: _PC. — Jail_ by
the following method:

**PERSON SERVED:**     A true and correct copy of the aforesaid papers were served on the above-named
party, to-wit: _Al Williams_ in the following manner:

✓_____     By personally delivering them into the hands of aforementioned person.

_____     (Substituted service) By leaving a copy of the papers at his/her dwelling house or usual place
of abode with some person residing therein who is at least 14 years of age, that person's
name and relationship to the above-named party being:

_____
(Name)                                                    (Relationship to defendant)

_____     By delivering a copy thereof to an agent authorized by appointment or by law to receive
service of summons, to-wit:

_____
(Name and Title)

_____     To the best of my knowledge and belief, said person was not engaged in the U.S. Military at
the time of service of process.

_____     AFTER DUE AND DILIGENT EFFORTS, UNDERSIGNED WAS UNABLE TO EFFECT
SERVICE.

**DESCRIPTION OF**       The person receiving the documents is described as follows:

**PERSON RECEIVING**     Sex: _M_   Skin Color: _B_   Hair Color: _B_   Facial Hair:_____

**DOCUMENTS:**           Age: _41_   Height: _____   Weight: _____

Distinguishing features: _____

| PROOF OF DUE DILIGENT ATTEMPT: | DATES OF SERVICE ATTEMPTED | TIME OF ATTEMPT | ADDRESS ATTEMPTED | REASON FOR NON-SERVICE |
|---|---|---|---|---|
| **FILED** | | | | |
| At 3:10 O'Clock P M | | | | |

MAR 2 8 2011

LYNN STILLWELL                    RONNIE WHITE, PHILLIPS COUNTY SHERIFF
PHILLIPS COUNTY CIRCUIT CLERK   By: _Jeremy Henson 311_, Deputy Sheriff
By_____ D.C.   Printed Name: _Jeremy Henson 311_